## JOE CARTER V. THE STATE.

No. 1765. Motion to Dismiss Decided November 16, 1898.

Decision on the Merits January 11, 1899.

Motion for Rehearing Decided February 22, 1899.

**1. Motion to Dismiss for Escape—Jurisdiction.**

It is only after the jurisdiction of the Court of Criminal Appeals has attached that an appeal will be dismissed on account of escape of appellant pending the appeal. Code Crim. Proc.. art 880. Where the appellant made his escape pending his motion for new trial in the lower court, and before he has been sentenced and given notice of appeal in the trial court to this court, the jurisdiction of this court had not attached, —the appeal was not pending, and the provisions of article 880 can not be made to apply to such escape.

**2. Bill of Exceptions—Sufficiency of.**

Inferences will not be indulged to supply defects in a bill of exceptions. The bill must be so full and certain in its statements that in and of itself it will disclose all that is necessary to manifest the supposed error. It must sufficiently set out the proceedings and attending circumstances below to enable the appellate court to know certainly what error was committed.

**3. Bill of Exceptions to Admitted Evidence.**

A bill of exceptions to admitted evidence, to be sufficient, must disclose clearly the grounds of objection made to the evidence; and grounds of objection not stated will be considered waived. It should be full, clear, and explicit, setting forth distinctly every fact essential to an understanding of the matters sought to be presented thereby; and where the evidence appears to be relevant and material this court will not presume that it was hurtful simply because the objection stated in the bill "was, that it was irrelevant, immaterial, and inadmissible, and calculated to injure the defendant."

**4. Same.**

Where the testimony is inadmissible under some supposable circumstances, if it be not admissible in the particular case, defendant should show it by his bill of exceptions.

**5. Same.**

A judge's certificate to a bill of exceptions does not certify to the truth of the facts stated in the objections, but only certifies to the fact that the objections stated were the objections urged.

**6. Murder—Venue—Charge.**

On a trial for murder, alleged to have been committed in B. County, where there was no testimony that the deceased was killed in any other county,—he was last seen alive in B. County, and his dead body was found in B. County,—there was no error in refusing to give a requested instruction as to the venue of the offense.

**7. Same—Corpus Delicti.**

See facts summarized in the opinion held amply sufficient to establish the identity of the deceased, and that deceased came to his death by violence at the hands of defendant, and that defendant killed him for his little money and effects.

### ON MOTION FOR REHEARING.

**8. Murder in the First Degree—Evidence Sufficient.**

See facts stated in the opinions of the court which, though circumstantial, are held sufficient to support a verdict and judgment of conviction for murder in the first degree with the penalty assessed at imprisonment for life in the penitentiary.

APPEAL from the District Court of Bell. Tried below before Hon. JOHN M. FURMAN.

Appeal from a conviction for murder in the first degree; penalty, imprisonment for life in the penitentiary.

The indictment charged appellant with the murder of a person, whose name was to the grand jury unknown, on the 7th day of July, 1895, by striking him with some instrument and weapon to the grand jurors unknown.

The following brief statement of the evidence is taken from appellant's brief, and is substantially correct:

About the last days of June, 1895, the appellant and a man who was called "Pat," "Mike" and "Old Man," chopped cotton for F. W. Van Zandt, in McLennan County. They were paid $1 each per day for their work. While at Van Zandt's appellant and Van Zandt's boys played cards for knives, a harp, and a little money. The old man bought the harp and paid 5 cents for it. The old man would not play and the appellant said that "he was afraid of his money."

After chopping cotton for a few days for Van Zandt, appellant and the old man left, and appellant was next seen at J. T. Jones' on Thursday evening after leaving Van Zandt's, some time between the 20th day of June and the 13th day of July, 1895. Appellant was in company with a man described by Jones as being "about 5 feet 5 or 6 inches high, probably a little taller, and probably weighed about 135 pounds; had a sandy or brown mustache, high forehead, hair combed back tolerably far; he was about 35 or 40 years old, and think his hair was sandy." These men left Jones' house on Sunday morning after shaving and changing clothes. Jones says the older man shaved clean except his mustache, which curled up at the ends; also that the older man had on a checked coat but that he did not notice his other clothes. The men went in the direction of Skinner's, and said they were going to get work. Late in the afternoon the appellant returned to Jones' and asked for his money, and also for the money due his companion. He left after receiving the money, taking with him one valise. If the two men had more than one valise, Jones did not see it while they stayed at his house.

Silas Clark was justice of the peace in July, 1895, and on the 10th day of July held an inquest over a dead body found in the Leon River under two large logs. The body was found in an out of the way place, and Clark describes the body as follows: "The body was that of a small man who weighed about 130 or 140 pounds, very much swollen, and was about 5 feet 6 inches high, short, thin, stubby mustache rather sandy, clean fresh-shaved face, dark hair, couldn't say black, tinged with gray, age 30 or 35 years, prominent forehead, high, hair commencing a good way back, wore Congress shoes about No. 6, had on a white shirt, a celluloid turn-down collar, a black scarf, had on pants and vest, coat was lying bundled up near the body and in the drift. The coat, pants, and vest were of the same material."

There were two wounds upon the body, either of which, Clark says, was sufficient to cause instant death. One was a horizontal wound above the right eye, an inch long, the other was near this ranging rather angling from the first. Clark says the river was very swift at the place where the body was found; had been as high as fifteen feet at about that time, and was still up when the body was found. Clark found in the dead man's pocket a pocketknife, comb, a lead pencil, a silver dime, a piece of French harp, and tobacco sack.

The other witnesses who viewed the dead body state substantially what Clark has stated except one or two witnesses who testified to having seen blood in a cow track and on the leaves of briars some fifty yards above where the body was found and between a small china tree and the river, and also state that they saw a few strands of human hair in a path, "where it looked like something had been dragged." They could not tell what kind of blood they saw in the track, and did not compare the hair found with the hair on the dead man's head. There was no evidence of any human footprints at or about the place where the blood was found, and no evidence of a scuffle, although it had rained just prior to the date of the alleged homicide.

W. M. D. Shelton says that he smelt something like cloth burning on Saturday or Sunday evening before the finding of the dead body in the river, and also that the body was found about 200 yards from the Coryell and Bell County line, and that the river, which had been up, began to fall on Tuesday night before the body was found.

William Fulkes says that he saw a place near the side of the road where a fire had been, and states it as his opinion that a valise had been burnt there, and gives his opinion as to what articles had been burned and what the articles found were.

B. F. Golden and his wife say that Carter came to their house on the Sunday before the body was found in the drift on the Leon River, at about 12 o'clock. He did not appear excited, was warm, and said he was looking for work. He and Golden left early after dinner in search of work, and found work at Skinner's. Carter then went to Jones' for his valise and returned to Skinner's with two valises. On the Friday evening after the dead body was found Carter returned to Golden's and brought with him two valises. Golden remarked, "Joe, you have got a new valise," and he replied, "yes." He left an old valise at Golden's house and took the new one with him.

June Dennis says that in the summer of 1898, he heard the appellant say in a jocular manner, "I have killed one man for eight dollars and forty-five cents, and could kill another."

Grainville Alexander says that soon after the dead body was found he saw the coat found near the dead body and that it looked just like John Weaver's coat and that he (Alexander) had one just like it.

Dr. Ghent testified that "a body submerged in the water like the Leon River until the skin and nails would slip from the hands upon the slightest touch, and the mustache from one side of his lip would come

off, would require to have been dead eight or ten days, but this depends upon so many conditions and circumstances that it is difficult to tell accurately; however, it is my opinion that the above length of time would have been required."

Dr. Nunn testified substantially as did Dr. Ghent, asserting it as his opinion that it would have required at least ten days for the decomposition above mentioned to have taken place.

Dr. R. S. Farr gave it as his opinion that a body in the state of decomposition as the body in question was, exposed to air and sunshine in July, would have been dead at least twenty-four to fifty-two hours, but that it depended upon so many circumstances that it was difficult to tell accurately anything about it.

*Robinson & Ferguson* and *J. B. McMahon*, for appellant.

*James P. Kinnard*, District Attorney of the Twenty-seventh Judicial District, and *Mann Trice*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant prosecutes this appeal from a conviction of murder. The conviction occurred on the 24th of August, 1898. A motion for a new trial was filed on the 25th. An amended motion for new trial was filed on the 29th of August, and on that day the defendant escaped from custody, and was recaptured on the 4th of September following, and returned to custody. On the 7th of September the motion for new trial was overruled, sentence pronounced, and notice of appeal given. On account of the escape, the Assistant Attorney-General moves a dismissal of the appeal. Article 880, Code of Criminal Procedure, provides that, pending an appeal to this court in this character of case, the escape of the defendant ousts this court of jurisdiction to hear and determine said appeal. But it only applies when the jurisdiction of this court has attached after the notice of appeal has been legally given. The conviction in this case was imprisonment in the penitentiary. Therefore it was necessary that sentence should be pronounced and notice of appeal given before the jurisdiction of this court would attach. By recurring to the facts, we discover that appellant's motion for new trial had not been acted upon, nor was sentence pronounced; nor was notice of appeal given at the time of his escape, nor for some days after his recapture. There was nothing therefore entered in the record which attached the jurisdiction of this court, and the appeal therefore was not pending in this court. The motion to dismiss said appeal is not well taken, and it is therefore overruled.

*Motion to dismiss overruled.*

HURT, Presiding Judge, absent.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life; hence this appeal.

The State offered to prove "by the witness William Fulkes, while on the witness stand as a witness for the State, that he saw where a fire had been made, near where the dead body of a man was found in the Leon River, which looked like where a valise had been burned, to which testimony defendant's counsel objected on the ground that said evidence was irrelevant, immaterial, and inadmissible, and was calculated to injure the defendant; but the court, over the defendant's objection, permitted the witness to testify to seeing the fire, and that the ashes and remains of the articles burned there impressed him (witness) that some one had burned a satchel there, and the court, over the defendant's objection, permitted said witness to testify, and identify some buttons and other small articles found in and around the place where the fire had been, as the same he took from the place," etc. The grounds stated upon which the objection is predicated are "that same was irrelevant, immaterial, and inadmissible." This points out no specific ground of objection, and, unless the testimony appears from the bill to be obviously inadmissible, the grounds urged will not be considered. "The general rule is that, where one objects to the admission of testimony, he should present the same by a bill of exceptions so full and explicit as that the matters therein presented for revision may be comprehensible without recourse to inferences. Inferences will not be indulged to supply omissions in the bill of exceptions. The bill must be so full and certain in its statements that, in and of itself, it will disclose all that is necessary to manifest the supposed error. It must sufficiently set out the proceedings and attending circumstances below to enable the appellate court to know certainly what error was committed. When a bill of exceptions is taken to the admission of evidence, the bill should clearly disclose the grounds of objection made to the evidence; otherwise, it is not entitled to be considered. The grounds of objection not so stated will ordinarily be considered as waived, as the bill of exceptions should be full, clear, and specific, setting forth distinctly every fact essential to an understanding of the matters sought to be presented thereby." McGlasson v. State, 38 Texas Crim. Rep., 351, and authorities there cited; 3 Enc. Pl. and Prac., p. 409, title 7, subdivs. 1-4; McGrath v. State, 35 Texas Crim. Rep., 415. Now, if we look to the statement of facts, it certainly occurs to us that it was not only relevant, but very material, for the State to offer circumstantial testimony tending to show that appellant burned a valise near where the body of the deceased was found. So that the objection, urged here by appellant, that that character of testimony was not relevant or material, would appear not to be well taken. If we are left to indulge inferences, we might suggest a number of grounds that, under certain circumstances and conditions, would render said testimony inadmissible, as that the testimony did not tend to connect appellant with the burning of said valise, or that there was no testimony tending to show that the valise was the property of the deceased, or that it was not the statement of any fact by the witness, but merely his opinion concerning a matter about

which it was not competent for him to give an opinion. But none of these grounds of objection are stated, and we are not authorized to supply them for the appellant. As stated above, the burden was on the appellant here to show by his bill that the court improperly admitted said testimony, and enough of the environments should have been stated in the bill to show its inadmissibility. The bill itself does not show that it by any means contains all the environments and conditions connected with said testimony, and for aught we know there may have been other circumstances, in connection with the testimony of said witness, that in his opinion a valise had been burned there, to have authorized him to give his opinion as to that matter. And, furthermore, the bill does not disclose how said testimony concerning the burning of the valise was hurtful to appellant. If we look to the bill alone, we fail to see how the statement that witness saw where something had been burned, not far from the dead body, and that, in his opinion it looked like a valise had been burned there, was injurious to appellant. The bare fact that the impression produced on the witness that a valise had been burned near there, without something more stated showing how that matter was used to the prejudice of appellant, can not be considered by us; that is, in the absence of a showing, we will not presume that said testimony was hurtful. 3 Enc. Pl. and Prac., p. 409, title 7.

By his second bill of exceptions, appellant raises the question as to the admissibility of a statement by appellant, made long after the alleged homicide, that he had killed a man for $8.40; but his grounds of objection, as stated in this bill, are the same as in the former, which we have discussed,—that is, that said testimony was "irrelevant and immaterial, and calculated to injure the defendant." This testimony was admissible under some circumstances, and, if it was not admissible in this particular case, appellant should have shown it by his bill. If there was no testimony tending to show that deceased was killed in the perpetration of robbery, then this evidence may not have been admissible; and it would have been a very easy matter for appellant to have so stated in the bill. If, however, there was testimony tending to show that deceased was killed in the perpetration of robbery, and that only a small amount of money was procured, then said testimony may have been admissible.

Appellant's third bill of exceptions is as follows: "On the trial of the above entitled cause, the State called the witness W. M. D. Shelton to the stand, and offered to prove by said witness, that, on Saturday or Sunday night before the dead body of the unknown man was found in the river, he (the witness) smelt something like cloth burning, to which testimony the defendant then and there objected, because irrelevant and immaterial, and because such circumstance was independent and unconnected with any other circumstances in the case, and was calculated to prejudice the defendant, which objection the court overruled, and permitted the witness to testify to having smelt something like cloth burning on Saturday or Sunday night, as above stated." If the fact that the

witness smelt something like clothing burning was independent and un-
connected with any other circumstance in the case, then, clearly, said
testimony was not admissible. But we do not understand the court to
certify, in this bill, that said matter about the witness smelling burning
cloth was not connected with any other fact in the case. This is simply
presented as appellant's ground of objection, and is not a certificate of
the judge that said fact was not connected with any other fact in the
case. Cline v. State, 34 Texas Crim. Rep., 347. So far as the bill is
concerned, it is not shown by it that the matter about which witness
was permitted to testify was not connected with other facts in the case;
nor is it shown how the fact that the witness may have smelt burning
cloth on the Saturday or Sunday night before the dead body of the un-
known man was found in the river was prejudicial to him. In order
to have .availed himself of this matter, the bill should have suggested
how it operated to the injury of appellant.

In our opinion, the court gave a sufficient charge on circumstantial
evidence, and the requested charge was not necessary. Nor do we
think it was necessary for the court to give the special requested instruc-
tions on venue. We do not believe that the testimony raised any issue as
to this matter. If the body found was that of the deceased, he was
evidently killed in Bell County. He was in Bell County when last seen
alive. About two hours after sun-up, on Sunday, July 7th, he and de-
fendant left Jones', which was about three or four miles from, and on
the east side of, the Leon River, going in the direction of, and intending
to cross, the Leon River, to look for work. Defendant, about 12 o'clock
of the same day, appeared at Shelton's, on the west side of the river,
about 400 or 500 yards above the drift, where the body was subsequently
found; but the deceased was not with him. The body of the deceased
was found in the drift in the Leon River, in Bell County, on Wednesday,
July 10th. About thirty steps above where the body was found, there
was a bloody place discovered in the path leading down to the river.
There was also testimony tending to show that a body was dragged
from where the blood was found to the river. Blood was found along
the path, and also some human hairs. This spot was shown to be 150
yards from the Coryell and Bell County line, in Bell County. We are
not informed how the Leon River runs with reference to said county
line. As stated above, we think it sufficiently appears, if the dead
body found was that of the alleged deceased, that he must have been
killed in Bell County; and, there being no testimony that he was killed
in any other county, the court was not required to give the requested
charge.

Appellant complains of the court's failure to give special charge num-
ber 2 asked by him on the subject of the corpus delicti. The court's
charge on this subject is ample, and we do not think there is any merit
in the contention of appellant. In this connection appellant also con-
tends that the verdict of the jury is not supported by the evidence, be-
cause the corpus delicti is not proved; that is, he insists that the dead

body found in the drift in the Leon River on Wednesday, July 10, 1895, is not shown to be the body of the alleged deceased. The indictment charged that the deceased was a person whose name was to the grand jury unknown. The proof on this subject for the State tended to show that the deceased was not known in that community, having appeared first at the house of J. T. Jones on the evening of the 4th of July, which was about three miles from where the body was subsequently found. The defendant, who was well known in that neighborhood, accompanied the deceased. They came from Coryell County, some twenty miles distant, having worked there together for one F. M. Van Zandt. They chopped cotton for Jones on the 5th and 6th of July. About 8 or 9 o'clock in the morning of Sunday, July 7th, they left his house, stating they were going across the river, to Skinner's, to get work. Each had a valise when they came to Jones', but they appear to have left their valises at his house; and it is also shown that Jones owed each of them $1.50 for chopping cotton, which they did not collect. Jones last saw them going in the direction of the Leon River. About 12 o'clock, on the same Sunday, the defendant appeared at B. F. Golden's, who lived on the west side of the river, about one mile from the Meadow crossing on the Leon River. He ate dinner there, and stated to Golden that he and a companion had worked for a man in Stampede Valley; that they separated at that man's house, his companion going towards the railroad, requesting him, if he did not return Monday morning, to ship his valise to Temple. He also told Golden that he had crossed the Leon River in Sam Reynolds' boat, and ran through the cornfield in order to reach Golden's for dinner. He seemed to be warm, and said he wanted work. After dinner, he left Golden's, and went to J. B. Skinner's, who lived a short distance from Golden's, on the west side of the river. He told Skinner that he crossed the Leon River on a drift back of Golden's house, and that he had been working for Jones in Stampede Valley. Skinner put him across the Leon River about 2 or 3 o'clock that evening, to go, as defendant stated, to Henry Skinner's, who lived on the east side of the river. He arrived at Henry Skinner's about 3 or 4 o'clock, and hired himself to work for him. He left there, on the same evening, to go to Jones' to get his clothes, as he stated. He arrived at Jones', who lived some four or five miles from Henry Skinner's, and on the same side of the river, some time late in the evening. He was there seen by Jones packing a valise. He collected from Jones the $1.50 due him, and also collected $1.50 due by Jones to his companion, stating that he had left the old man, who had left there with him that morning, over on the river, and that the old man had authorized him to collect his money for him. He told Jones that he was going down to Henry Skinner's, to work for him for $1 a day. When he left there, Jones only noticed him have one valise. When he arrived at Henry Skinner's that night, however, Skinner testified that he brought two valises with him,—one answering the description of the valise Jones testified to seeing, which was evidently the old man's valise, and the other being a

black valise, answering the description of the appellant's own valise. He stated nothing to Henry Skinner about any person having been with him at Jones'. He worked for Skinner two days. On Wednesday he went to work for Robert Fulkes, and was working for him when the dead body was reported to have been found in the drift in the Leon River, about one and one-half miles from Fulkes' house. Neither he nor Fulkes went to the body, but, on some one reporting that the skull of the body was found to be crushed by a blow, evidently with an ax, defendant remarked that he did not see how they could tell whether it was crushed with an ax, or by being struck with logs in the river. From here defendant went to Golden's, taking the two valises with him. He left the black valise at Golden's, but took the other one from there. At Golden's appellant claimed the valise was a new one, which he had gotten the previous spring. When he left the neighborhood, John Skinner put him across the river Friday night. On this occasion he told young Skinner that, the Saturday night previous, about 12 o'clock, he had crossed the river on the drift. This was the last time he was seen in that neighborhood for several months. A number of witnesses, who had seen the companion of defendant (who is called in the record the "old man") describe him,—among them the Van Zandts and Jones, with whom they had worked. They describe him by height, size, weight, and age. They describe him as a small man, of light or sandy complexion, 35 or 40 years of age, weighing 135 to 140 pounds. At Van Zandt's, he appears not only to have had a mustache, which is described as a reddish or sandy mustache, but a reddish or sandy stubby beard. He had a high forehead. The deceased, when found, although his body was considerably decomposed, was described by the witnesses as presenting the same general appearance as the old man who had worked with the defendant at Van Zandt's and Jones'; that is, he was described as a small man, weighing apparently 135 or 140 pounds, light complexion, high forehead, dark-looking hair, and a reddish or sandy mustache. And, as an especial circumstance of identity, the record shows that, on the Sunday morning before appellant and his unknown companion left Jones', the old man shaved his beard off, leaving only his mustache. The body found in the drift of the river on the following Wednesday is stated by the witnesses to have been clean shaved, except the mustache. Furthermore, the testimony shows that clothing similar in description to that worn by the old man, the companion of the defendant on that Sunday morning, was found with the body of the deceased. The witnesses identify the kind of coat found in the drift near the body of the deceased as the same kind of coat worn by deceased. It is also shown that the old man bought a harp at Van Zandt's, and that when the body was found there was a piece of a broken harp in his pocket. It was also shown that the old man had, when at Van Zandt's, some money, which he carried in his pocketbook. No pocketbook was found on the body of the deceased. Only a loose silver dime was found in his pocket. When the body was found, the skull was crushed and broken in two

places, two separate blows having been inflicted on the forehead, and the skull was crushed all the way between these two fractures.

We have summarized above the principal facts tending to show identity,—that is, that the body found in the river was the body of the old man who had been working with the defendant, and was his companion, —and we believe they sufficiently show that the body found was that of the old man who left Jones' with the defendant to cross the Leon River on that Sunday morning. See Kugadt v. State, 38 Texas Crim. Rep., 681, and authorities there cited, particularly State v. Martin, (S. C.), 25 S. E. Rep., 114. If this was the body of the alleged deceased, and we think the jury were authorized to determine this question as they did, then, evidently, the deceased came to his death by violence, because it is abundantly shown that the wounds on the head were sufficient to cause death; and we think the circumstances show that deceased must have been killed in the path, some thirty or forty yards above the drift where the body was subsequently found, as the indications there found on the ground suggest this theory. Deceased was last seen alive with defendant on that Sunday morning, and he has never been seen or heard of alive since that time. The body found corresponded in every essential respect with that of the comrade and traveling companion of defendant. Defendant's conduct, in taking possession of his property and appropriating it, indicates his motive in committing the homicide. With reference to the name of deceased being unknown, we think that was sufficiently shown by the testimony, and the charge of the court on that subject properly submitted the issue to the jury. The judgment is affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

HENDERSON, JUDGE.—This case was affirmed by us at a former day of this term, and now comes before us on motion for rehearing.

Appellant's principal contention is on the ground that the corpus delicti was not proved. He insisted on this proposition originally, but he again urges it with much zeal, and in an able and exhaustive argument. In the course of his discussion, appellant calls our attention to some discrepancies or errors made in stating the facts of the case. In the original opinion we described deceased as being of light or sandy complexion. In this we were in error, as we fail to find his complexion when alive anywhere described. However, this creates no discrepancy between the description of the unknown man who was seen with appellant last on the 7th of July, and the body found in the drift in the Leon River.

Our attention is also called to the fact that the hair of the unknown man seen with appellant at Van Zandt's and Jones' was light or sandy, whereas the hair of the dead person found was dark or black-looking. This difference appears to exist, though no witness states that he ex-

amined the hair of the deceased critically.    Two or three witnesses merely state that it was dark-looking or black.    Shelton, however, describes the strands of hair found in the path along which the body was dragged to the river as like the hair of deceased.    While no critical examination was made in this respect, yet it would seem, in general appearance, as observed, there was no material difference between the hair of the stranger, as seen at Van Zandt's and Jones', and that on the dead body.    It must be borne in mind, in this connection, that the hair on the body, when seen, had been submerged in the water for several days.

We are also reminded that there is no evidence showing that appellant and his companion came from Coryell County to Jones' farm.    It is true, we stated that they came from Van Zandt's in Coryell County.    The county is not stated in the record.    It is merely stated that Van Zandt's is some nine miles from Moody and some eighteen miles from Waco.    It may be in McLennan County, possibly in Coryell.    This is not a material matter.

It is also suggested that we have made a very grave error in stating that appellant and the old man, his traveling companion, brought two valises to Jones'.    We did so state, and we believe from the testimony, we had a right to state that as a fact.    True, Jones says he noticed but the one valise, and that he saw appellant, when he returned to his house on Sunday evening for his clothes, packing a valise.    One of the valises was larger than the other.    The smaller one may have been packed by appellant within the larger.    At any rate we know from the testimony that each of the parties had a valise when they were at Van Zandt's.    They are described, one as black, and one of gray cloth.    The gray one was larger than the black one.    They left there with said two valises, and went to Jones'.    When they left Jones', on Sunday morning, July 7th, to cross the Leon River, seeking work, they carried no valise with them.    They were last seen by Jones going in the direction of the river, and appellant evidently crossed the river near the spot where the dead body was subsequently found.    He appeared at Golden's about 12 o'clock alone, and there stated that his companion, who was with him at Jones', had gone to the railroad.    He recrossed the river that evening, and secured work at Henry Skinner's.    About 3 or 4 o'clock he left Henry Skinner's to go to Jones' for his clothes.    While Jones only noticed him leaving with one valise, yet he appeared at Henry Skinner's that night, bringing with him two valises,—one described by him as a black one, and one a lead-colored; one being larger than the other.    On the ensuing Friday night he again crossed the river to B. F. Golden's. He then had with him two valises,—one a black and the other a telescope valise.    He stated to Golden that he had gotten him a new valise.    When he left there he packed and took with him the new telescope valise, leaving the black one at Golden's.    Now, if appellant did not get the two valises from Jones' that he brought with him that evening to Skinner's, where did he get them?    Evidently there is no escape from the proposition that

he brought these two valises from Jones', and one of them is the same character of valise that belonged to deceased at Van Zandt's. He not only appropriated this valise to his own use, but when he went to Jones' he informed him that he left the old man "over on the river," and had been requested by him to collect $1.50 which Jones owed him, and which he then paid him. It is not necessary to discuss the matter further, or to further summarize the testimony. In the original opinion we stated that we believed the testimony was sufficient to sustain the finding of the jury; and notwithstanding the very exhaustive review of the evidence indulged in by appellant's counsel, we see no reason to change our former opinion. The motion for rehearing is overruled.

*Motion overruled.*

DAVIDSON, Presiding Judge, absent.