### BOB MCKINNEY v. THE STATE.

#### No. 1953.   Decided January 24, 1900.

**1.   Bill of Exceptions.**

It has been repeatedly held that the assertion of a ground of objection in a bill of exceptions is not equivalent to a certificate of the judge that such ground existed.

**2.   Same—Confession.**

Where a bill of exceptions was reserved to the admission of defendant's confession to an officer within fifteen minutes after the killing, upon the ground that a sufficient predicate had not been laid to authorize its introduction, and that defendant was in a state of intoxication and did not understand the warning given him by the officer; Held, that there being nothing aside from the grounds stated to sustain these allegations in the bill, the same was of no validity. The bill should have shown the environments or circumstances under which the confession was made, and these should reasonably have shown that when it was made defendant was so intoxicated as not to understand the warning or caution given him by the officer.

**3.   Same—Reference to Statement of Facts.**

The court on appeal is not permitted, in order to help out a bill of exceptions, to recur to the statement of facts.

**4.   Charge of Court—Implied Malice.**

Where the general charge of the court on implied malice is correct, and authorized the jury, if on any account they believe the defendant's mind was not calm and deliberate, to acquit him of murder in the first degree, and further told them they could not convict of murder in the second degree in case they found the killing was actuated by a   mind perturbed or excited by passion, Held, this was a sufficient and correct view of the law on implied malice.

**5.   Murder in the First Degree—Evidence Sufficient.**

See facts stated which are held to be amply sufficient to support a verdict and judgment for murder in the first degree with penalty assessed at death.

APPEAL from the District Court of Hunt.   Tried below before Hon. HOWARD TEMPLETON.

Appellant was tried and convicted for the murder of Margaret Leslie, by shooting her with a pistol, the jury assessing his punishment at death.

We give below the testimony of the principal witnesses in the case, as follows:

Nannie Crowder testified: "I am a sister of the deceased, Margaret Leslie, and I lived in the city of Greenville at the time she was killed by Bob McKinney, this defendant, on the 22d day of September, 1899. On the 22d day of September, 1899, Bob McKinney, in Hunt County, Texas, shot my sister Margaret Leslie with a pistol, and from the effect of that shot she died in Hunt County, Texas, on the same day, and immediately upon being shot.   The deceased and myself lived together and kept house in a three-roomed house on South Johnson Street, in Greenville, and it was my understanding that Bob and Margaret were too intimate.   Bob bought food sometimes and brought it to our house, and when he would do this Margaret would cook it for him, but this would only occur at irregular intervals, and when Bob was angry with his wife at home.   Bob had no room of his own nor

under his exclusive control at our house, nor did he have anything to do with paying any part of the rent; he just came to our house when he had trouble at home; he had a house and family of his own some distance from the house at which we lived. I understood that Bob disliked for any other man to show any preference for my sister, or for her to notice other men; and I also understood that he had a fight with one Ben Pierce, at a festival, on account of my sister, a few weeks before the killing. On the morning of the killing, Bob was at our house at a very early hour, and at that time he gave me a drink of whisky. He came back again about half-past 12, and when he came, he walked right onto the gallery. Our house faced west on Johnson. which runs north and south at that point, and our house stood on blocks about four feet high; passing our house there was a plank walk that was on a level with our floor, with a six-foot gallery facing west. As this house and gallery stood back from this plank sidewalk, there was also a plank walk from our gallery, about four feet wide, which ran out and connected with the public plank walk which passed the house parallel with Johnson Street. When Bob came to our house, after 12 o'clock, at which time the killing occurred, I was at home. Ben Pierce and Simon Smith had both been there just a short time before, just a few moments, and Simon Smith had gone over to a neighbors about fifty feet away, but I do not know where Pierce had gone, though he had gone entirely away and was not about the place. As Bob came up to our house and crossed over from the public sidewalk on our little plank walk, and came onto our gallery, my sister, Margaret Leslie, was sitting in a chair on the edge of the door. When Bob came up, he addressed my sister, the deceased, saying, 'I see you have been having company.' I replied to this, that Ben Pierce and Simon Smith had been at our house, and 'that there was no harm done.' As I said this, Bob stepped from the gallery into my sister Margaret's room, and called her to come to him. She refused to come to him or to get out of her chair, and she told him that he ought to go home to his wife. As she told him this I walked out to the edge of the public walk and called Simon Smith to come to me, and as I did so, Bob walked out of the room onto the gallery and said to my sister, 'Did I not tell you that I would die for you?' and as he said this he pulled his pistol at her, the ball striking her in the forehead between the eyes, killing her instantly. About the time Bob spoke of dying for my sister, Simon Smith came up close to where I was standing (in response to my call), and as Bob turned from my sister, after killing her, he glanced at Simon Smith and shot him, from which shot he also died the next day. I did not actually see the shot that killed Smith, for I turned and ran around the house, and I heard the second shot just as I turned around the corner of the house. I came immediately back to the front of the house and saw Simon Smith lying out on the ground on the side of the public walk, where he fell when Bob McKinney shot him; and I saw my sister lying out on the floor dead, where she fell when McKinney killed her; and I saw Mc-

Kinney walking off north towards the track of the railroad, which at that point ran east and west between our house and the main part of town."

Rose Vincent testified to the same facts as given in the testimony of Nan Crowder, except that she was not related to any of the interested parties. She further testified that at the time defendant came to the house and killed the deceased and Simon Smith, he, McKinney, was cool and deliberate and perfectly sober, as indicated by his appearance. She also testified that "immediately after killing Margaret, defendant turned around and shot Simon Smith, who was standing still, doing nothing."

W. B. Horton, a constable, testified: He arrested the defendant a few moments after the killing and took his pistol away from him. On the way to the jail, and after he had cautioned and warned defendant that whatever he might say could be used as evidence against him and not for him on his trial, defendant said, "I killed the damned sons of bitches and am going to hell for it, but don't care if I do." He further testified the defendant did not appear to be drunk or excited.

W. B. Hardin, deputy constable, testified that he also warned defendant as to any confession he might make, and after that defendant told him that "he had killed them and was glad of it." This witness also testified that defendant was cool and sober at the time.

For defendant, Marshal Medlock, his wife, and mother-in-law, A. B. Shaw, all testified substantially to the same facts, as follows: Simon Smith, who was killed at the same time as the deceased, Margaret Leslie, had a room at the house of Shaw for some years. He was a just man, and a deacon in the "True Vine Baptist Church." On the night before Margaret Leslie was killed, Simon came home to our house to supper about sundown. Said that he had heard that Bob McKinney was mad at him. That one night, about four months previous to the killing, he, Simon, was at Bob's house late at night, when he thought Bob was in the country. That Bob surprised him and came home and caught him in his house. That all the fastenings were locked or barred, except a side or back door, through which Bob came; and that when he first looked up and saw Bob, he, Smith, was sitting with Bob's wife on the side of the bed; and that he had to stand Bob off with a skillet until he, Smith, could get out of the house. That shortly after the above occurrence, he was walking down the railroad track with Bob's wife, when Bob overtook them and said, "Here, didn't I tell you never to let me see you with my wife any more?" That he, Smith, picked up a large iron pin and again stood Bob off, and then and there told him, Bob, that if he ever said "woman" again to him, he, Smith, would kill him, defendant. Simon Smith repeated all this to us just as he finished supper, and shortly after that he went up town to get some gin for a lame back. He was gone about half an hour. I suppose he really went after the gin, as I saw some on his shelf next morning. Simon was a man that talked much, but I never heard him say anything else about Bob nor

his wife, though they lived right close to us. We never visited at the McKinney house.

Defendant, Bob McKinney, in his own behalf, testified: "On the morning that I killed Margaret Leslie and Simon Smith, I was at Margaret's house. I had slept at home with my wife that night. Afterwards and during the forenoon, I went over to North Greenville and played cards a while. I then came back through town, taking an occasional drink. I went up to Dude Hall's and played pool a while, taking a drink there, and then I think to my own house. This was some time about noon. I asked my wife for a dime to buy some cartridges, but she said she had no money. I took a new shirt that I had, rolled it up, and went out intending to sell it. I met Gad Ellis on the railroad track, and told him I wanted to sell the shirt for a little money. He asked me why I wanted to sell it, and I told him that I wanted to buy some cartridges; that there was a negro in my way, and I wanted to get him out. Gad Ellis gave me 15 cents, and went on to town. That morning I took a pistol out of Mr. Smith's second-hand store. It was a 38-caliber pistol, and the one I shot the negro with. I had no one's consent to take the pistol. I went to Wyse's store, where I bought a round of cartridges. I then took another drink, and by this time it was about 12 o'clock. I then went down to Margaret Leslie's house, walked into Margaret's room, and called her, but she would not come out, and talked to her a little, and then remarked as I did so, 'I see you have had company.' Nan Crowder said, 'Yes, Ben Pierce and Simon have been here, but they did no harm.' About this time Margaret was sitting down close to the door, and Nan walked out and called Simon Smith from the neighbor's house. I had seen Pierce leaving the house as I came up. I was expecting fatal trouble with him whenever I met him. I loved Margaret, and decided to kill her, so that if I should get killed she would not be left for Pierce to enjoy. After I shot Margaret, I went home and told my wife that I had killed that God damned Margaret. As she fell over, I turned and shot Simon Smith, who fell off the plank walk when I shot him. About four months before this I had caught Simon with my wife in my own house, and he had stood me off with some sort of weapon, though I had forgiven my wife for that offense, and had since lived with her as my wife. I killed Margaret because I dearly loved her, and I love her yet."

No briefs for appellant found with the record.

*Rob't A. John,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree and his punishment assessed at death, and he prosecutes this appeal.

Appellant's first bill of exceptions raises an objection to a confession of appellant to W. B. Horton, the officer who arrested him. The bill

showed appellant was under arrest and the officer warned him in accordance with the statute; and thereafter, while on the way to the jail the officer asked him why he did that (i. e., killed deceased), and defendant replied, "I killed the sons of two bitches and am going to hell. I went there to kill them." This statement or confession was objected to by appellant on the ground that no sufficient predicate had been laid to authorize the introduction of the confession, and that the statement or confession was made within fifteen minutes after the killing and while defendant was in a state of intoxication, and it was not shown that he understood the so-called warning given by the officer. Aside from the grounds stated there is nothing in the bill showing defendant was in a state of intoxication and did not understand the warning or caution given him. It has been repeatedly held that the assertion of a ground of objection in the bill is not equivalent to a certificate of the judge that such ground existed. In such case the bill should have shown, as a preliminary matter, the environments or circumstances under which the confession was made, as that it was shown when appellant made the confession he was so intoxicated as not to understand the warning or caution given him by the officer. If the bill had shown this by a proper certificate of the judge, unquestionably the statement or confession of appellant under such circumstances would not have been admissible. Under the rules prescribed for preparing bills of exception and under the decisions of this court we can not regard a ground of objection to the testimony stated in the bill, as a certificate of the judge to the effect that the fact alleged as a ground of objection existed.

If we recur to the statement of facts to ascertain the condition of appellant's mind at the time he made the confession, the grounds stated are without support. On the contrary, it appears appellant was not intoxicated, and did understand the warning given him. However, we are not permitted, in order to help out a bill of exceptions, to refer to the statement of facts; and we only allude to this for the purpose of showing that evidently the judge did not intend to certify the grounds stated by appellant in his objections to the testimony were true in point of fact, but merely that he objected to the grounds stated.

Appellant excepted to the charge of the court on implied malice. We have carefully examined the same, and in our opinion the charge given is a correct definition of implied malice.

Appellant asked the court to give a special instruction on implied malice predicated on a certain state of facts recited by him in the charge. We think the court gave a sufficient charge on implied malice, and do not believe the charge asked embodied a correct view of the law on implied malice. Under the facts of this case we do not see any particular reason why defendant's mind should have become excited because one of the witnesses called Simon Smith. True, he and Simon Smith had some previous quarrels and difficulties in regard to the appellant's wife; but this matter appears to have been condoned. At

any rate a general charge on implied malice authorized the jury, if on any account they believed appellant's mind was not calm and deliberate, to acquit him of murder in the first degree; and they were authorized to convict him of murder in the second degree in case they found the killing occurred in a mind perturbed or excited by passion.

Appellant contends the evidence does not sustain the conviction of murder in the first degree. We can not agree to this. The evidence shows that the motive for killing deceased (who was appellant's paramour) was an apprehension or belief on appellant's part that she was trying to get rid of him. He appears to have made preparation for taking her life, and so far as the record shows, his mind was not disturbed or excited, but was cool and deliberate. He procured a pistol beforehand, then bought his ammunition, and went to the house of his paramour; and because of her evident desire not to make up with him, he deliberately slew her. True, there is some testimony showing that during the day and prior to the homicide he had taken a number of drinks, but there is nothing to indicate to our minds that he was intoxicated. The court, however, gave a charge on temporary insanity produced by the recent use of intoxicating liquors, and authorized the jury to consider the same in mitigation of the punishment, or with reference to the degree of murder, if they found the defendant guilty of murder. The jury evidently did not believe appellant's mind was disturbed by the use of intoxicating liquors to such an extent as to reduce the homicide from murder in the first to murder in the second degree. In this they were amply warranted by the facts; and they were furthermore warranted by the facts in finding appellant was guilty of having planned and carried out in a calm and deliberate mind the murder upon express malice of deceased, and we do not feel authorized to disturb their verdict. The judgment is affirmed.

*Affirmed.*