## Tom Conger v. State.

### No. 818. Decided October 18, 1911.

### Rehearing denied November 15, 1911.

**1.—Assault to Rape—Statement of Facts—Stenographer—Waiver—Estoppel— Certiorari.**

Where, upon appeal from a conviction of felony, it did not appear from the record whether the court appointed a stenographer—the statement of facts being copied in the record signed by the attorneys of both parties and approved by the judge—and the same did not appear to have been made in duplicate, and it further appeared that the assistant attorney-general at the time waived the sending of the original, a motion to strike out is overruled; besides, the original could have been obtained by certiorari.

**2.—Same—Sufficiency of the Evidence.**

Where, upon trial of assault with intent to rape, the evidence supported the conviction, there was no error. Following White v. State, 60 Texas Crim. Rep., 559, and other cases.

**3.—Same—Bill of Exceptions—Practice on Appeal.**

A bill of exceptions should be full and explicit, so that the matters presented to the court for revision may be comprehensible without recourse to inference. Following Eldridge v. State, 12 Texas Crim. App., 308, and other cases.

**4.—Same—Bill of Exceptions—Practice on Appeal.**

The bill should be so explicit as to enable the court on appeal to fully understand all the facts upon which the correctness or error of the rulings depend. Following Livar v. State, 26 Texas Crim. App., 115, and other cases.

**5.—Same—Bill of Exceptions Must be Full.**

The bill of exceptions must set out the proceedings in the court below sufficiently to enable the Appellate Court to know that an error has been committed. It must be so full in its statement that in and of itself it will disclose all that is necessary to manifest the supposed error, and state evidence enough to render intelligible the ruling excepted to. Following Thomson v. State, 29 Texas Crim. App., 208, and other cases.

**6.—Same—Bill of Exceptions Can Not be Aided.**

The bill of exceptions can not be aided either by a statement in reply to a motion for a new trial, or by a statement of facts. Following Cline v. State, 34 Texas Crim. Rep., 347, and other cases.

**7.—Same—Bill of Exceptions Controls.**

Upon appeal the bill of exceptions controls even the statement of facts. Following Brisco v. State, 27 Texas Crim. App., 193, and other cases.

**8.—Same—Bill of Exceptions—Ground of Objection.**

Objections in a bill of exceptions, or the mere statement of the ground of objections in the bill, is not the certificate of the judge that what is stated is true. Following Douglas v. State, 58 Texas Crim. Rep., 122, and other cases.

**9.—Same—Evidence—Complaint of Prosecutrix.**

Upon trial of rape the complaint of the outrage by the injured female made within a reasonable time is always admissible in evidence, and the length of time intervening only goes to the weight of the testimony.

**10.—Same—Evidence—Appearance—Excitement.**

In trials of rape the appearance of the clothes and person of prosecutrix, when they excite remarks, are admissible in evidence, even if she does not immediately complain without being interrogated, and if interrogated her complaint is admissible, and her testimony is a question of weight and not of admissibility. Following Sentell v. State, 34 Texas Crim. Rep., 260, and other cases.

**11.—Same—Evidence—Bill of Exceptions.**

Where, upon appeal from a conviction of assault to rape, none of the bills of exception showed that the witness was permitted to give the details of the assault, or what she told the various State witnesses, there was no error; besides, the bills were so defective they could not be considered.

**12.—Same—Evidence—Demeanor of Prosecutrix.**

Upon trial of assault to rape, there was no error in admitting testimony that the prosecutrix was crying when she made complaint of the outrage upon her. Following Peffering v. State, 40 Texas, 486, and other cases; specially, as defendant undertook to contradict prosecutrix's appearance, etc.

**13.—Same—Argument of Counsel—Bystanders—Bill of Exceptions.**

A bill of exceptions by bystanders must be sworn to by the parties making it; and where this did not appear, but the record showed that after a defective bystanders' bill was presented to the judge he prepared one of his own which was accepted, the court's bill will control.

**14.—Same—Argument of Counsel.**

Where, upon trial of assault to rape, the argument of State's counsel in the main was supported by the evidence, and that which was improper could not have injured the rights of the defendant, there was no reversible error.

**15.—Same—Charge of Court—Force.**

Where, upon trial of assault to rape, the court in his charge gave the statutory definition of force, there was no reversible error in refusing requested charges which required more force than that which the statute requires. Following Anchicks v. State, 6 Texas Crim. App., 524, and other cases.

**16.—Same—Charge of Court.**

An objection that the court's charge is confusing and misleading is too general to be considered.

**17.—Same—Charge of Court—Article 723.**

Objections to the charge of the court without requesting special charges are not viewed with favor; and unless the error complained of was calculated to injure the rights of the defendant, no reversible error is presented in view of Article 723, Code Criminal Procedure.

**18.—Same—Whole Charge Must Be Considered—Special Charge.**

The whole charge of the court must be taken into consideration in determining complaints against any part of it, and when no special charges have been requested, it will be held sufficient.

**19.—Same—Charge of Court—Presumption of Innocence.**

Where the court's charge expressly instructed the jury upon the presumption of innocence, improper expressions in other portions of the charge upon the question of guilt are not reversible error.

**20.—Same—Charge of Court—Sense of Shame.**

Where the charge of the court taken as a whole is not reasonably susceptible to the construction that the jury was authorized to find the defendant guilty of

assault to rape if a sense of shame was created in prosecutrix's mind, etc., there was no reversible error.

**21.—Same—Charge of Court—Force—Words and Phrases.**

Where, upon trial of assault to rape, the court's charge on the subject of force was, if anything, a happier expression than, and at least in substance if not literal compliance with the statute, there was no reversible error.

**22.—Same—Charge of Court—Words and Phrases—Reasonable Doubt—Presumption of Innocence.**

Where, upon trial of assault to rape, the court properly charged on the presumption of innocence and reasonable doubt, and there was no special charge requested thereon, there was no error under Article 723, Code Criminal Procedure, and the omission of the word "will" is not material.

**23.—Same—Charge of Court—Intent—Force—Aggravated Assault.**

Where, upon trial of assault to rape, the court's charge on intent, etc., while not always happily expressed, yet, as a whole, was correct and did not shift the burden of proof, and the evidence showed a specific intent to rape, there was no reversible error.

**24.—Same—Charge of Court—Consent—Burden of Proof.**

Where, upon trial of assault to rape, the question of consent and of nonconsent was submitted in the charge of the court, there was no error.

**25.—Same—Charge of Court—Aggravated Assault—Intent.**

Where, upon trial of assault to rape, the evidence disclosed either a specific intent on the part of the defendant to commit rape or nothing, and the court in his charge submitted the law of assault to rape as well as aggravated assault, the same was more favorable than the law required.

**26.—Same—Charge of Court—Weight of Evidence.**

Where, upon trial of assault to rape, the court's charge did not assume that an offense was committed, the same was not on the weight of the evidence. Following Railsback v. State, 53 Texas Crim. Rep., 542, and other cases.

Appeal from the District Court of Wood. Tried below before the Hon. R. W. Simpson.

Appeal from a conviction of assault with intent to rape; penalty, three years imprisonment in the penitentiary.

The opinion states the case.

*Harris & Suiter* and *Jones, Cathey & Jones,* for appellant.—Upon question of complaint by prosecutrix as to the outrage upon her: Holst v. State, 23 Texas Crim. App., 7; Reddick v. State, 34 S. W. Rep., 274; Carter v. State, 70 S. W. Rep., 971; Kearse v. State, 88 S. W. Rep., 363.

Upon question of argument of State's counsel: Kugadt v. State, 38 Texas Crim. Rep., 681; Morris v. State, 39 Texas Crim. Rep., 371; Byrd v. State, id., 609; Ware v. State, 92 S. W. Rep., 1093.

Upon question of specific intent to rape: Carter v. State, 70 S. W., Rep., 971; Hudson v. State, 90 S. W. Rep., 177; Fewox v. State, id., 178; Porter v. State, 33 Texas Crim. Rep., 385.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, Judge.—In April, 1910, the grand jury of Wood County indicted the appellant for an assault with intent to commit rape upon Naoma Dickey by force, alleged to have occurred on January 30, 1910. He was tried at the April term, 1910, of the said court, found guilty and his punishment assessed at three years in the penitentiary.

The State has made a motion for this court to strike out and not consider the statement of facts in the record because it has been copied in the record and the original not sent up as a separate paper, claiming that under the stenographers' Act of 1909, p. 374, such statement so copied in the record, the original not being sent up, is not a legal statement of the facts and can not be considered.

That Act of the Legislature authorized but did not require the judge of the District Court of Wood County, to appoint a court stenographer. It does not appear to us anywhere in the record whether the court appointed a stenographer or not. The statement of facts copied in the record does not purport to have been made by a stenographer but appears to have been prepared by appellant's attorneys and the district attorney and approved by the judge. That Act of the Legislature expressly provided that it should not be construed so as to prevent parties from preparing statements of facts on appeal independent of the transcript of the notes of the official shorthand reporter, even when one had been appointed by the court. The Act further requires, in the event the court stenographer made out the statement of facts, that he should do so in duplicate and certify thereto. That both the original and duplicate should be filed in the court below, the duplicate preserved there and the original sent to this court in case of an appeal. There does not appear to have been made a duplicate of the statement of facts in this case, but what is in the record purports to be a certified copy of the original made by the clerk as a part of the record in this case.

We take it that a proper construction of the said stenographers' Act, in connection with the facts we have given above, would authorize, if it did not require, statements of facts made out as this was, to be copied as was the practice and law before this Act was passed. In addition to this and in resistance to the State's said motion to strike out as shown to us by the certificate of the district judge and the sworn affidavit of one of appellant's attorneys that at the time this statement of facts was presented to the judge for his approval, the Honorable J. A. Mobley, then the assistant attorney-general of Texas, and assigned to this court, was present and was asked by the judge if this statement of facts should be copied by the clerk and sent up as a part of the record, or the original sent, and Mr. Mobley replied that it would be proper to copy it and that for the State he would make no question about it and that it would be all right. The judge thereupon ordered and directed the clerk to make a certified copy thereof as

a part of the record and send it, with the other record, instead of sending the original. No question is made of the truth of these matters. The appellant contends that the State is estopped from making and insisting on this motion.

It is our opinion that under the facts and circumstances given above that it was proper for the clerk under the law to copy as was done in this case, the statement of facts as a part of the record instead of sending the original here. And that the State is estopped from making and insisting upon this motion to strike out.

In addition to this, the appellant has made a motion for certiorari to require the district clerk to send up the original statement of facts in the event this court should strike out this statement of facts. The result of this would be simply to delay the case and as we have a true copy of the statement of facts, the said motion to strike out is denied and also the appellant's motion for certiorari is denied, and we consider the statement of facts in the record in disposing of the case.

The statement of facts in this case is about 130 full pages of type-written matter which would make perhaps 200 pages of ordinary printed matter. We have carefully gone over and considered it, time and again, in arriving at the disposition of the case. There was much dispute in the testimony. The State's main witness, the young girl assaulted, was supported in her testimony by many facts and circumstances and some of her testimony was also disputed by others and by some of the circumstances. It is unnecessary to give these. The law, Code Criminal Precedure, Art. 766, says: "The jury in all cases are the exclusive judges of the facts proved, and of the weight to be given to the testimony." . . . All these matters were, therefore, exclusively for the jury. The evidence from the State's standpoint is amply sufficient to sustain the conviction. We will therefore give, succinctly only, some of the evidence which must have been believed by the jury which fully justified the verdict.

The young girl assaulted, Naoma Dickey, was fifteen years of age on October 17, 1909, less than three and one-half months prior to the assault which occurred on January 30, 1910. The first time she had ever seen, known or met the appellant, who was a young man about 22 years old, was on January 15, 1910, at night at a party at one of her neighbors where they were introduced and when she talked to him only about fifteen minutes. He lived at Quitman, some twelve or fifteen miles from where she lived. She lived in the country. At this party he informed her that he and a friend of his, Jim Denton, expected to return to that community in about two weeks, his friend to call upon Miss Willie Jones, one of her friends, and he made a conditional engagement with her at that time for him to see her at the home of Miss Willie Jones. This, however, was conditioned upon his informing her by mail of whether or not he and his friend would call. On the next Tuesday after the party on Saturday night, he did write

her a letter and informed her that he and his friend would make and carry out the conditional engagement he had made with her. She answered the letter agreeing to the arrangement. Her friend, Miss Willie Jones, lived about two miles from her and had two sisters. Miss Willie and her two sisters were grown young ladies. She then arranged to spend Saturday night with them at their home, where appellant and his friend were to call the next day, Sunday, and did so. Sunday evening about 2:30 or 3 o'clock, appellant and his friend arrived at the house of Mr. Jones in appellant's buggy, where all of the young ladies were. Another young lady was visiting them and another young man was there at the time calling. This other young man, Gus Caton, it appears, who had gone to Mr. Jones' in the morning and spent the day there, had no connection with the appellant and his friend. After appellant and his friend reached Mr. Jones,' where the young ladies were, they remained at the house all together for about thirty minutes. Either appellant or the young man who was there when appellant arrived, proposed going driving. It was thereupon, arranged that Mr. Caton should take Miss Myrtle Jones and appellant the young girl assaulted, appellant taking her in his buggy and Caton taking Miss Jones in his. The two couples went out together to the buggies. There was no understanding between them where they were going. They were just going driving. They started about half past three in the evening. The other couple drove off first and got about fifty yards ahead before appellant and the young girl started. They all started off in the same direction. The road from Mr. Jones' house went into another public road a short distance from Jones' house. Appellant, for awhile after they started, drove slowly. The other couple driving faster. The young girl, the complaining witness, then testified substantially this: "Tom drove slow after we started off, we did not keep up with the other buggy, they drove fast and Tom continued to drive slow, the other buggy got out of my sight; the other buggy was out of sight when we got to the place where the Golden road intersected the Alba and Quitman public road, near Mr. Butts' house. The last time I saw the buggy Gus and Myrtle were in was about one-half mile from Mr. Jones' house; Tom and I were then on the Golden road going south, and were about one-half mile down the Golden road. This Golden road went into another road; when we got to the place where the Golden road intersects the Quitman and Alba roads, I said, 'Where is Gus and Myrtle?' and Tom said, 'That was them going east down the Quitman and Alba road towards Quitman,' and I said to him, 'We want to be sure to follow them;' he said, 'We were;' when we got down to where the Golden road intersected the Quitman and Alba road we turned east, the Quitman and Alba road does not go by Mr. Jones'; the Golden road does not cross the Alba and Quitman road; it stops when it gets to the Quitman and Alba road. When we turned east we were going towards

Alba and Golden. When we turned east towards Quitman, I saw a buggy ahead of us, I thought it was Gus and Myrtle, it was going east; we did not overtake that buggy, we just barely kept in sight of it all the way and it finally got entirely out of our sight; Tom was driving slow at this time; we drove slow all the way down there, his horse was walking most of the way; there was nothing said by either Tom or myself about driving fast. Well, I did tell him one time to drive up before we got into the Quitman and Alba road, I wanted to keep up with Gus and Myrtle, and we got down there and he told me that was Gus and Myrtle, and they, meaning Gus and Myrtle, were then out of sight; Gus and Myrtle had gone west after getting into the Quitman and Alba road; the buggy we saw going east had gotten out of my sight when we got to the river; I suppose it was about three miles from where we turned east towards Quitman to the river. We went across the river. I did not meet or see anyone before we got to the river, from the time we left the house of Mr. Jones, until after we had crossed the river; the character of our conversation was about going to school and first one thing or another; up until after we had crossed the river there had been nothing unpleasant about his conversation, he had done nothing to me up to that time. About one and one-half miles west of the river he offered me some chewing gum; I did not take his gum; he got the gum he offered me out of his pocket. There was about three small blocks of gum, I think; I told him I did not chew gum; he insisted very much upon me taking the gum but I did not take it and he put it back in his pocket. When we crossed the river I thought Myrtle and Mr. Caton were ahead of us; I did not know it; after we had crossed the river we went on east about one-half mile and the defendant drove out into the woods; there were no houses or fields along there after we had crossed the river, nothing at all except woods. It was about two and one-half miles back west to the nearest house; it was about fifty yards from the slough bridge to where he turned out of the road into the woods; it was only a short distance from where we turned out of the road to the slough bridge; he turned out on the right hand side of the road coming east towards Quitman; the place where he turned out of the road was a little old dirt road that did not look like it had been traveled in a good while. I asked him where he was going and he told me he was going to the spring to get some water; I told him I was not going to the spring with him in the woods to get water; I asked him to turn around, he would not do so and I tried to jump out of the buggy and he grabbed me and held me; he caught me by my arm, he held me by my arms; at the time I started to jump out of the buggy it wasn't no piece from the Quitman and Alba road; as soon as I saw he was going to turn out of the road I tried to jump out; he drove down into the woods for about one-half of a mile, I suppose. He did not turn me loose, he took me down there into the woods and got out of

the buggy and said he was going to get him some water and walked off a little piece from the buggy and I started to pick up the lines; he stopped his buggy about one-half mile from the Quitman and Alba road.   After he caught me to hold me in the buggy he went about one-half mile before he turned me loose; he caught me as quick as he left the road; I was begging him to turn me loose and was trying to get out of the buggy all the way from the road down to where he stopped his buggy and he held me and would not let me get out. After he had stopped his buggy he got out of the buggy and went a little distance from the buggy; I picked up the lines and he saw I was going to get the lines and he ran back and he told me he dared me to touch the lines.   I do not know how close we were to the creek at that time; it was a thickety country; it was in the bottom, where he stopped his buggy; he was sitting on the right side of the buggy at the time he got out; I do not remember which hand he was holding me with, he had hold of my arms and was holding me by the arms; he got out of the buggy on the right hand side of the buggy; after I got hold of the lines and started to drive off he came running back to the buggy and dared me touch the lines and got back in the buggy; he then began to put his hands all over me and kissed and hugged me and at that I began to cry and scream and he jumped up and dragged me out of the buggy out on the ground; he tried to get me away from the buggy; I was holding to the buggy; he could not get me down; he kept trying to put his feet between my feet; I tried to scream; he put his hand over my mouth and said, 'Darn me, he would kill me if I did not hush;' I told him he would have to kill me before he could take me away from the buggy; he then sorter turned me loose and as I started to get in the buggy he gave me a shove and said, 'Dad gum it, get in the buggy right now;' I got in the buggy and he jumped in and grabbed hold of me and put his hand up under my clothes and undid one of my supporters and I kept screaming and I thought of a hat pin I had and I stuck him with it, and when I did that he sorter quit and said, 'Oh my God, you have killed me,' or something that way. I do not know whether I stuck him or not, I tried to stick him two or three times but I do not think I hit him but once; he sorter quit for a little while and then he began to put his hands under my clothes and I began to scream and he said, 'The next time you go to scream I will take you so far in the woods you will not scream,' and said, 'I do not have to go to Jones after Jim Denton, he can get home all right;' I kept screaming; he put his hand over my mouth and I was begging him to quit and I kept trying to get out; he would not let me out; I started to get out and he jerked me by the skirt and tore my skirt; finally I got out of the buggy and started to walk home; I got a little piece from him; he told me to get back up in the buggy; if I knew what was good for me, I had better get back in there; then he said, 'Dad gum you, get in the buggy right now if you know what is good for

you, you had better get in.' I got in the buggy and we started off and we got up there and he told me he was coming back into our country to some more parties and I had to treat him right. When he got me out of the buggy I was holding to the wheels of the buggy. I screamed just as loud as I could. As to my hollering, he said, 'Hush your screaming, some one will hear you and come down here;' I told him that is what I wanted them to do; he told me the next time I screamed he would take me so far into the woods I would never get back; I suppose I was out of the buggy about five minutes at the time he was trying to throw me down; he just kept trying to throw me down; I kept screaming and hollering and holding to the buggy—No, it was not that long; I do not know exactly how long we were out of the buggy. When he stopped his buggy, he had turned it almost around; at the time he got out of the buggy the horse's head was almost north; when he came back to the buggy and got in, he came around on the east side of the buggy. After he got back in the buggy he put one arm around my waist and had his other hand up under my clothes; he was just sitting up there with his face turned sorter towards me; I could not tell you just exactly what position he was in, his face was turned around towards me. I was fighting him all the time trying to make him quit, you know; while he was up there in the buggy one of his feet was down there, he sorter held one of his feet under mine, sorter down under mine, sorter down under mine, his feet was sorter down under mine. I hollered as loud as I could, I do not know how many times I hollered, but I was hollering most all of the time I was out of the buggy and I was crying; after I got back in the buggy the first time, he did not quit until I got out; I kept trying to get out of the buggy and at last I got out some way or other. I kept begging him to take me home; he said the quicker you do what I want you to do the better it will be for you, and said, 'When you do what I want you to do I will take you home;' I told him he would have to kill me before I did what he wanted me to do. I believe that is about all he said."

She further testified that on their return, when they got near Mr. Jones' house, appellant told her that she had better not go in the house and tell Willie Jones what had happened if she knew what was good for her; that she told him she would tell her brothers and they would kill him, and he said, "Whenever you get ready to tell them, tell them to come on; I live in Quitman and am in business over there." She further said, "After I got back up to where I was not afraid to tell him, I told him he was not a gentleman; I told him I knew what he tried to give me your gum for, and he said I was a witty little devil." The other couple who had driven off at the time appellant and this young girl did went and returned from the opposite direction that appellant went. They returned to Mr. Jones' about the same time. She got out of the buggy herself, went into the house, appellant followed

her, where he remained some fifteen or twenty minutes; she said nothing to him, nor he to her and he then left. In appellant's assault upon her out in the river bottom her waist and clothes became unpinned and her skirt was torn across the front. Her hair comb was broken, part of it lost, and her hair all disarranged. As soon as they returned and got into the house, Miss Carrie Sullivan said to her, "Why, girl, what in the world ails your hair?" She did not remember what she replied, but said nothing much, when Miss Sullivan said: "O, yes, the wind has been blowing." As soon as the appellant left, Miss Carrie Sullivan and Willie Jones, and she following, went into a room and one of them asked what was the matter. She began to tell them the full facts of the assault made by appellant upon her and before concluding it, or while telling it, they all went out of the room into the garden where she finished telling them fully what had occurred. Shortly afterwards she was taken to her home in a buggy by the young gentleman who was calling on the young ladies at Mr. Jones.' After she reached Mr. Jones, and on the way therefrom to her home, she was sad, felt awfully bad, had been crying and on the way home talked very little. The witness who took her home testified that he was well acquainted with her and knew her disposition; that she was rather a pleasant and lively little girl as a general rule; that after she came back from the drive with appellant she appeared to be sad; that that was her condition when she went home,—she was out of the ordinary after the drive as to being quiet and apparently sad. When she reached home and immediately after the young gentleman who took her home left and who remained for only some fifteen minutes, her sister, Miss Agnes Dickey, walked into the room where she was, and at once saw that something was the matter with her and that she had been crying, her hair was down and her dress torn, remarked, "What does this mean?" And thereupon Miss Naoma made the complaint to her sister about the conduct of the appellant towards her.

On cross-examination she testified: "When he got down to where he stopped his horse he sorter turned his horse 'round and he got out of the buggy; he went a little piece from the buggy; he said he was going to get a drink of water; after he got out of the buggy I started to pick up the lines and he saw me and he came back to the buggy; he did not go behind a little bluff or bank, he went about twenty or thirty feet from the buggy; at the time he got out of the buggy he said he was going to get a drink and tried to get me out of the buggy; he said let us go down here and get some water; I told him I was not going to do it; I was sitting there crying and I let him get a little piece off and picked up the lines; I thought I could get away from him and he saw me and came back to the buggy. When Tom got out of the buggy he dropped the lines down on the buggy wheel and walked off; I had been trying to jump out of the buggy from the

time he left the road until this time; I picked up the lines this time; Tom was in the buggy, he jumped into the buggy and then he began to put his hands all over me and he kissed me; the horse did not start; he put his hands up here, (indicating her breast) and hugged and kissed me; I was trying to push him off; I was pushing him all the time the best I could, but I could not do much with him; he got out of the buggy and pulled me out; he caught me around the waist and jerked me out some way or other, I do not remember exactly just how he got hold of me. He took me out on the right side of the buggy, he jumped out of the buggy but did not say anything at the time he jumped out, but just caught hold of me and jerked me out; he just pulled me away from the buggy and I screamed; he told me to hush and put his hand over my mouth and told me, 'Damn me he would kill me,' and told me to hush or some one would hear me and come down there and I told him that was what I wanted them to do. I first screamed when he began to kiss me and put his hands over me before I got out of the buggy, but I did not do it and I screamed as loud as I could when he pulled me out of the buggy; I screamed while he was pulling me in the buggy. I screamed as loud while I was in the buggy, but did not scream as much while in the buggy as when he pulled me out of the buggy. When he pulled me out of the buggy I caught hold of the front wheel of the buggy; I do not know where the lines were at that time. I kept screaming and he saw he could not get me away from the buggy and he got afraid some one would come down there, I reckon, so he sorter turned me loose; I turned to get in the buggy and he gave me a shove and told me, 'Dad gum me, to get in the buggy;' it was just as I was getting in the buggy that he gave me a shove; I put my foot on the buggy step to get in; the defendant was standing on the ground; he did not hardly turn me loose at all when I got in the buggy; I had hold of the buggy seat and the dash board and he jumped in the buggy about the time I got in; he put his hands under my clothes and I began to scream and tried to stick my hatpin in him; every time I tried to start the horse he stopped it; when I stuck him with the hatpin he said something about me killing him and sorter quit; he stayed quiet no time; I tried to jump out of the buggy and he grabbed me; I was begging him to take me home, and he said the 'quicker I did what he wanted me to do the quicker he would take me home.' At the time he quit he was sitting there holding me round my waist and arms and I was begging him to take me home; I was crying.

"When we were down in the bottom, at the time I was out of the buggy, I mean at the time Tom had pulled me out of the buggy, I was standing between the buggy wheels holding to the wheels with both hands; Tom at that time was trying to pull me away from there, he was putting his feet between my feet trying to throw me down. I think he had his hands ahold of my arms, I do not remember just

exactly; he did not kiss me while I was out of the buggy, while I was holding to the buggy I was screaming all the time; I do not remember how long I had hold of the buggy wheel, something like about three minutes; I quit screaming when I got back in the buggy. I screamed after he got back in the buggy and began to put his hands under my clothes; it was while I was out of the buggy and while I was screaming that he told me if I did not hush some one would come down there; it was while I had hold of the front wheel of the buggy he told me that. It was when he was out of the buggy on the ground that he put his hands over my mouth; my feet were the only part of me that was ever on the ground, I never got my clothes soiled or dirty any way by being on the ground. After he got in the buggy he put his hand under my clothes. I was trying to push him away with my hands; his feet were down there in the buggy somewhere. Besides sticking the hat pin at him I hit him, I hit him on the head and anywhere I could hit him; I do not remember whether I scratched his face or not; I did a little of everything to make him quit. Yes sir, I hit him in the face; I do not have the least idea how long we were in getting back from the place in the bottom to Mr. Jones'; I do not know what time of day it was when we got back, it was before sun down, we were down there in the bottom about thirty minutes, I guess, maybe longer; the first time I screamed was when he began to put his hands all over me and kiss me; after I got in the buggy the last time the defendant did not do anything else to me, he took me on to Mr. Jones'; Mr. Bud Jones, the father of Miss Willie Jones, was at home that afternoon; his wife, the mother of Miss Willie Jones, was also there; I think Mr. Jones brought a load of wood into the room where we all were and made a fire while I was there after we had returned from the drive. Tom told me two or three times I had better not say anything about this to Miss Willie Jones; he told me that one time on the road when we were returning home and about the time I started in the gate he came up behind me and said, 'You had better not go into the house and tell Miss Willie Jones;' he only mentioned Miss Willie Jones and he said, 'Don't you tell nobody about it.' I did not speak to Mr. Bud Jones after I returned from the drive that afternoon."

Question: "Now, Miss Naoma, I would like for you to state again what it was that Tom said he wanted you to do down there at the buggy when you say he had hold of you?" Answer: "Why he told me that 'the quicker I did what he wanted me to do,' he never did come out and say what it was he wanted me to do, he said it would be the best for me, and he told me that he 'would assure me that there would be no hereafter to it.' He told me several times the quicker I did what he wanted me to the better it would be for me." Question. "And that is the way he said it?" Answer. "Yes sir, and then he assured me there would be no hereafter about it. I do not remember what all I did say, he just kept telling me the quicker I did

what he wanted me to do the quicker he would take me home; I told him then I never would do that, I said 'I never will, you will have to kill me before you can take me away from this buggy. At this time he was sitting there holding me by the arm and around the waist, just sitting there by my side. I do not remember which arm he had around my waist, the left one, the right one, I reckon, well, I do not know. I was trying to get his hand down."

On redirect examination she testified: "The first thing the defendant did after he got back in the buggy down in the bottom was to put his arms around me and kiss me; I let him do that because I could not help it. Yes sir, it was done over my objections; he was holding me around the waist when he did that; to get him to quit I fought him and tried to punch his head off, and asked him to quit and he would not do it; at the time he got back in the buggy the first time my feelings were just terrible; I just felt awfully scared and everything. I was frightened, I was scared nearly to death, at the time when he first got into the buggy, after he had gone a little piece from the buggy; I was sitting there crying; he never did throw me down but he tried to, but he never did get me down."

Question. "Now tell all he did while he was on the ground?" Answer. "Why he just kept putting his feet between mine and putting his knees between mine and I was screaming and he kept holding me there and he kept trying to throw me down with his feet or some way or other and kept trying to throw me down and he could not throw me down and after while he turned me loose and I got back up in the buggy." Question. "Now, after you got up in the buggy, tell that jury, Miss Naoma, exactly what he did and how he did it, just describe it to the jury?" Answer. "Well, he got back up there and began to put his hands up my clothes and put his hands all over me and he broke one of my supporters and he kept trying to put his knees between mine and kept putting his hands under my clothes and I was screaming and I stuck him with a hat pin. Yes sir, he did try to separate my lower limbs, he kept trying to pull my knees apart with his hands and kept trying to put his knees between mine some way or other, trying to get my knees apart; no sir, he never did get between my knees, but he put his hands between them; no sir, he never did get his knees between my knees; this was all without my consent. I was crying most all the way back to Mr. Jones' house; he kept trying to fix it all over and get me in a good humor; he told me he was coming back over there to some parties and said I had to treat him right and everything that way; I did not tell him anything down there and after he got to where I was not afraid to tell him, I told him I never intended to speak to him again, and everything that way. I told him he had not treated me right. No, sir, I do not believe I remember anything else he said to me on the route; he told me that I had better not tell it; said it would not be good for me if I told it;

said I did not have to tell anyone about it. I told him he would have to pay for it and he said he would not either, he said he would swear that I was willing to everything he had done, and he said he would put a whole lot more to it and tell I did everything and said it was not what the girl tells that goes, it is what the boy says; he told me that; no sir, I believe I do not remember anything else he said; yes sir, he asked me why I did not faint, he said I was the most nervy woman he ever saw; we were close to Mr. Jones' when he told me that. Yes, sir, I told him I would tell my brothers and he said, 'Any time you want to tell them, tell them I am in business over there in Quitman,' and said, 'I have always got my crowd,' and he told me right where to tell my brothers to come and everything.

The appellant testified and denied making any assault upon Miss Naoma, but testified that in the drive that evening he put his arms around her; that the occasion for this was, he asked her if she wasn't cold; that the weather was pretty cold and the wind from the west. He claims that she turned around and asked him if he could not keep her warm; that it was at this time that he put his arms around her, around over the back of the buggy; that he kissed her during the drive. The first time was when they were going up the hill,—fifty to seventy-five yards from where he put his arms around her shoulders. After he got to the top of the hill he removed his arms because it was open and the Golden road intersected there with another road. The next time he put his arms around her was when they were two or three hundred yards from Mr. Jones'; that he kept his arms around her then for probably a quarter and removed them because they came to an old field which was unfenced. That he didn't put his arms around her any more until they reached the creek; that his kissing her and putting his arms around her was with her consent and not objected to by her. He then denied practically seriatim all of the testimony of the complaining witness, Miss Naoma, as to his treatment of her and assault upon her and denied that she holloed, screamed or cried, etc. It is unnecessary to a correct understanding of the case to give any further statement of the evidence. What we have given is more extensive than we had intended to give.

The evidence, the whole of it, fully justified the verdict of the jury. White v. State, 60 Texas Crim. Rep., 559, 132 S. W. Rep., 790; Ross v. State, 60 Texas Crim. Rep., 547, 132 S. W. Rep., 793; Stewart v. State, 60 Texas Crim. Rep., 92, 133 S. W. Rep., 1051.

Appellant's bill of exceptions No. 1, as most, if not all, of the others, is wholly insufficient to authorize or require the court to pass upon them.

As an illustration of these bills we will give the first substantially fully. It is this: "Be it remembered that upon the trial of the above numbered and entitled cause, the following, among other proceedings, were had, to wit; that while the prosecuting witness, Miss Naoma Dickey,

was on the stand testifying as a witness for the State, she was asked the following question by the district attorney: Q. Now after he left (meaning the defendant) who was the first one you talked to? A. Willie Jones and Carrie Sullivan." After which counsel for the defendant objected and requested permission of the court to ask the witness some questions for the purpose of getting their objections clearly before the court, which request was granted by the court after which counsel for the appellant propounded the following questions to the witness to which the witness gave the following answers. It is unnecessary to give these questions and answers in full as they are given in the record in the bill of exceptions. We will give fully the substance of the testimony which is: "Returning that evening to Mr. Jones,' we met two girls about a mile or mile and a half west of the river bridge. I did not know them and said nothing to them. The defendant said something to them but I don't remember what it was. We did not stop but kept driving. When we got to Mr. Jones' and went into the hall I met Willie Jones and Carrie Sullivan, but did not talk to them any. We stopped there awhile but I did not say anything. The defendant also stopped there; I was across the porch from him. He stopped but a little while and I went into the house and they all followed me. While the defendant was there in the house, Miss Carrie said, 'Why, girl, what in the world ails your hair?' I don't remember what I told her. I never said much of anything and Carrie said, 'O yes, the wind has been blowing.' After the defendant left they took me off in a room and asked me what had happened."

Here the defendant's counsel objected to any proof of any complaint made by this witness to either Miss Willie Jones or Carrie Sullivan, because said complaint, if any, was not voluntarily made by the prosecuting witness, but was made in answer to questions propounded to her by them and because the same is no part of the res gestae and the same was a statement made at a time and place when the defendant was not present and could not bind him and is wholly immaterial and inadmissible for any purpose.

The court overruled these objections and the witness then, in answer to questions by the district attorney, testified: "It wasn't no time; just as quick as the defendant left, I had a conversation with Carrie Sullivan and Willie Jones in the parlor. They told me to come on; I got in there and one of them asked me what was the matter and I just told them all about it." Thereupon, appellant's counsel made the same objections to this testimony as stated above which the court overruled and permitted the witness to testify as stated. The court in allowing the bill qualified it by stating: "The appellate court is requested to examine the statement of facts which will show the complaint was entirely voluntary and free from any suggestions."

We have had occasion recently, in several cases, to restate briefly the rules that have been uniformly adhered to and enforced in this court

as to what bills of exceptions shall show and when they are deficient in these particulars that this court can not and will not review the questions attempted to be raised thereby.

These rules, we again reiterate. The allegations of a bill of exceptions should be full and explicit so that the matters presented to the court on appeal for revision may be comprehensible without recourse to inference. Eldridge v. State, 12 Texas Crim. App., 208; Davis v. State, 14 Texas Crim. App., 645; McGlasson v. State, 38 Texas Crim. Rep., 351. They should be so explicit as to enable the court on appeal to fully understand all the facts upon which the correctness or error of the rulings depend, otherwise they will not be considered. Livar v. State, 26 Texas Crim. App., 115; Walker v. State, 19 Texas Crim. App., 176; Hennessy v. State, 23 Texas Crim. App., 340; Thompson v. State, 29 Texas Crim. App., 208; Ballinger v. State, 11 Texas Crim. App., 323. A bill of exceptions must set out the proceedings in the court below sufficiently to enable the court on appeal to know that an error has been committed. It must be so full in its statements that in and of itself it will disclose all that is necessary to manifest the supposed error, and must state enough of the evidence or facts proven to render intelligible the ruling excepted to. Thompson, supra; Tweedle v. State, 29 Texas Crim. App., 586; Quintana v. State, 29 Texas Crim., 401; Hooper v. State, 29 Texas Crim. App., 614; Wilkerson v. State, 31 Texas Crim. Rep., 86; Ballinger v. State, 11 Texas Crim. App., 323; Rahm v. State, 30 Texas Crim. Rep., 310; Walker v. State, 33 Texas Crim. Rep., 359; Yungman v. State, 35 Texas Crim. Rep., 80; Mootry v. State, 35 Texas Crim. Rep., 450; Gonzales v. State, 32 Texas Crim. Rep., 611; Attaway v. State, 31 Texas Crim. Rep., 475. A bill of exceptions can not be aided either by a statement in reply to a motion for new trial, or by the statement of facts. McGlasson, supra; Howerton v. State, 43 S. W. Rep., 1018; Cline v. State, 34 Texas Crim. Rep., 347; Gay v. Texas P. Ry., 30 (Texas Sup.) S. W., 543; Buchanan v. State, 24 Texas Crim., 195; Smith v. State, 4 Texas Crim. App., 626; Hamlin v. State, 39 Texas Crim. Rep., 579; Edens v. State, 41 Texas Crim. App., 522, 55 S. W. Rep., 815; McAnally v. State, 57 S. W. Rep., 832; Price v. State, 43 S. W. Rep., 96; Carter v. State, 40 Texas Crim. Rep., 225; Ogle v. State, 16 Texas Crim. App., 361, 58 S. W. Rep., 1004; Diaz v. State, 53 S. W. Rep., 632; Hopkins v. State, 53 S. W. Rep., 619; Brown v. State, 43 Texas Crim. Rep., 293; Schweir v. State, 50 Texas Crim. Rep., 119. The bill of exceptions controls even the statement of facts. Briscoe v. State, 27 Texas Crim. App., 193; Ezzell v. State, 29 Texas Crim. App., 521; Aroia v. State, 28 Texas Crim. App., 198. Objections in a bill of exceptions or the mere statement of the ground of objection in the the bill, is not the certificate of the judge that what is stated is true. Douglas v. State, 58 Texas Crim. Rep., 122; Alexander v. State, 133 S. W. Rep., 436; Hardgreaves v. State, 135 S. W. Rep., 132; Fuller v.

State, 50 Texas Crim. Rep., 14; Bigham v. State, 36 Texas Crim. Rep., 453; Hamlin v. State, 39 Texas Crim., 579; McKinney v. State, 41 Texas Crim. Rep., 434; James v. State, 61 Texas Crim. Rep., 222, 138 S. W., 612. See also the cases collated on this subject in White's Code Criminal Procedure, secs. 857 and 1123.

Tested by these authorities, which are uniform and always followed by this court, it is unnecessary to point out specifically the utter lack of conformity therewith of this bill in this case under discussion. They are all so apparent it is needless to point them out.

However, this court has uniformly, in accordance with all text-book writers and rules of evidence governing such matters, held that com- plaint by the injured female of the outrage committed upon her when made within a reasonable time is always admissible in evidence, and the length of time intervening between the act and the complaint goes to the weight and not so much to the admissibility of the testimony. And so when the appearance of her clothes and her person excite remark, even if she does not immediately complain without any ques- tion asked her, and is merely asked what is the matter and then states her complaint, it would be admissible and the fact that she was asked the question and made the statement in reply thereto, would go to the weight and not to the admissibility of the testimony. This court, through Judge Davidson, in Sentell v. State, 34 Texas Crim. Rep., 260, said: "Morris testified for the prosecution, that on the morning of and shortly after the assault by appellant upon the prose- cutrix, he saw her, about a half a mile from appellant's house, walking with bowed head, and with appearance of having been crying, and at her request took her to town, and thence to her home. She was greatly excited, and was trembling, and told him that appellant had insulted her. In going to town they passed appellant's house, when she became more excited and nervous. Appellant, when he discovered them passing, followed after, and demanded that the girl be left at his house. The girl, by permission of her mother, had been living with appellant's family some time, as a companion for his wife. The state- ments of the girl to Morris when he first met her were objected to by appellant. The objection was not well taken. The fact that complaint of the outrage was made by the injured female, in cases of rape and assaults to rape, is admissible in evidence, and the length of time intervening between the act and the complaint goes to the weight, and not so much to the admissibility of the testimony. The details of the transaction or complaint made by the girl were not stated by this witness, if so made to him. It was clearly shown, that she had told others about the outrage by defendant, had sought protection from them, tried to borrow a pistol for self-defense against appellant, and this was proven without objection, and this before she met Morris. It is not clear by any means that it should have been rejected, even if the details had been testified to, under the facts stated. The intervening

time may have been an hour or more, but the girl was excited, nervous, and trembling; and the facts rather tend to preclude the idea of design in fixing up or manufacturing the story told by her. Castillo v. The State, 31 Texas Crim. Rep., 145." Reddick v. State, 35 Texas Crim. Rep., 463; Caudle v. State, 34 Texas Crim. Rep., 26, and cases therein cited. It is needless to multiply authorities on this question.

Bill of exceptions No. 2 is substantially the same as No. 1 above discussed and is equally as defective. It merely follows the testimony of Naoma Dickey and shows that before completing her statement to Willie Jones and Carrie Sullivan, but as a part of the same, they all went from the room, where it began, at once to the garden and was there completed. In none of these bills is it shown that the witness was permitted to give the details of the assault or what she told these various witnesses. She was simply permitted to state that she then and there made a complaint to them relative to the matter. The judge, in allowing this bill, qualified it by stating this: "With the request that the statement of facts be referred to in connection with this bill." This but illustrates the necessity for the bill of and within itself containing all that is necessary for this court to determine the question. The work of this court would be interminable if, in order to see whether the questions raised were or were not admissible, it had to undertake to hunt them out in a record containing,—a statement of facts alone,—of 130 pages.

Appellant's bills Nos. 3 and 4 are of the same character and show the same defects as the two above discussed. They are to the question of the testimony of Miss Willie Jones, showing that Naoma Dickey, the assaulted party, made complaint to her. The qualification by the judge to bill No. 3 is: "That the statement of Miss Dickey was not given in response to questions, but was the voluntary outcry of prosecutrix and reference is made to the statement of facts in connection with this bill."

Appellant's bill No. 5 is equally as defective as the others above noted. It was as to the testimony of Miss Willie Jones to the effect that when Naoma Dickey made complaint to her and Miss Sullivan, "she was crying," to which appellant objected because the same was immaterial and irrelevant and a matter that did not occur in the presence of the defendant and is only calculated to prejudice the rights of the defendant before the jury. Besides this bill being wholly insufficient to require the court to consider it, the law is that this character of testimony in this character of cases is clearly admissible. Pefferling v. State, 40 Texas, 487; Rogers v. State, 1 Texas Crim. App., 187; Topolanck v State, 40 Texas 160; Ruston v. State, 15 Texas Crim. App., 377; Johnson v. State, 21 Texas Crim. App., 368; Rhea v. State, 30 Texas Crim. App., 483; Price v. State, 35 Texas Crim. Rep., 501; and especially is this the case when the appellant undertakes to contradict the complaining witness, and to show that nothing was

wrong as to her condition, to her appearance, and her clothing, and that she did not cry and had not been crying, as testified to by her and others.

What we have said about the insufficiency of the previous bills of exceptions equally applies to appellant's 6th, 8th and 9th bills, wherein the State proved by some of the witnesses the condition of the mind and appearance of the prosecuting witness when she was carried from Mr. Jones' to her home and very soon after her arrival at home and immediately upon a member of her family seeing her. The court qualified these bills by stating "that while the prosecutrix was on the stand the defendant's counsel, by questions, attempted to make her state that she had been pleasant and agreeable to defendant at Mr. Jones' and had pleasantly invited him to return, all of which she vehemently denied and this testimony was admitted to show her state of mind." Under the circumstances, if the bills had been so prepared as to authorize us to consider them, the testimony was clearly admissible.

Bills of exceptions 12 and 13, pertain to the same matter and will be considered together. There are two 12th bills of exceptions. The first complains that when the district attorney was making his closing argument to the jury, he used this language: "That the evidence in this case shows that this child (meaning prosecutrix, Miss Naoma Dickey), did not speak one word to the defendant from the time that he reached the home of L. A. Jones until the time this libertine and rapist (meaning the defendant) left the house." To which the appellant objected "as improper and asked the court to instruct the jury not to consider it, but the court neither rebuked the district attorney nor instructed the jury to disregard said language." It seems the court refused the bill prepared by appellant on this subject and prepared the above instead, and qualified it as follows: "The above and foregoing bill of exceptions and following qualification is prepared by me, in lieu of bill of exceptions No. 12. I was engaged in writing my charge while the district attorney was speaking and did not hear the remarks, but counsel interrupted the district attorney and thereby attracted my attention. I was instructed to instruct the jury to disregard the remarks of the district attorney, but not having heard same and the district attorney in answer to counsel's objections to his remarks having said to the jury, in substance, 'Gentlemen, I am speaking from the testimony in this case and my accusation of the defendant is based upon the facts testified to by the witnesses,' I declined to take any action. The bill as presented, has been agreed to by the district attorney and I therefore approve same with this qualification." Following this bill there appears in the record a statement purporting to be signed by three witnesses which perhaps was intended to be a bystanders' bill of exceptions because the court refused the appellant's 12th bill as prepared by him. This statement, however, is not sworn

to by either of the parties and neither are there any supporting affidavits whatever thereto. Considering the whole matter, we take it, that when this whole question was presented to the lower court with this statement by these bystanders that the Judge then, while he had refused appellant's 12th bill, prepared his own in lieu thereof with the qualification made by him and that it was accepted in lieu of the original bill and the matter was not further contested or supported by affidavits. As we understand Revised Statutes, Article 1369, it is necessary that a bystanders' bill of exceptions shall be sworn to by the bystanders or supported by the affidavits of others, at least. Otherwise, a mere, simple statement, not sworn to by bystanders, would overcome the certificate of the presiding judge who always acts under his official oath.

Bill of exceptions No. 13, shows that the appellant requested and the court refused to give on this subject, this charge: "Gentlemen of the jury, I instruct you that you will not regard or consider the remarks of the district attorney wherein he referred to the defendant, Tom Conger, as a libertine and rapist, as the same were wrong and improper and should not have been made." No such requested charge appears anywhere else in the record or otherwise than as stated.

In the case of Morris v. State, 39 Texas Crim. Rep., 371, this is said for this court, through Judge Davidson: "Appellant excepted to the following remarks made by the district attorney in his closing argument: 'It was the lust of this wretch that caused the crime. After he had raped the poor blind child he murdered her in cold blood; and, if he is permitted to go free, then God help your children and the children of the country.' I will tell you the motive: After he had raped the child, she told him, "I will tell mamma;" and he told her, "If you do, I will kill you;" and she repeated, "I will tell mamma;" and, gentlemen of the jury, he killed her.' The contention is that these remarks were calculated to inflame the minds of the jury, and warp their judgment, and that the prosecuting attorney constituted himself a witness, and detailed a conversation between the dead child and the defendant that had not been proved. The court qualified this bill by stating that when the district attorney used the expression 'this wretch,' the court warned him that he must not indulge in personal abuse, and the jury were told to disregard such language; that it was improper, and not to be considered by them. In regard to the remarks as to motive, there was testimony that the defendant had stated that he had killed the child, because he tried to get her to promise that she would not tell her mamma that he had tried to ravish her, and the child refused to make the promise, and for this reason he killed her. Under this state of case, the argument was justified. Counsel was simply reiterating, in his peculiar way, the testimony that had been adduced before the jury."

We believe that bills of this character should, within themselves,

like other bills, show a sufficient statement of the evidence and argument used so that this court can tell therefrom, and not have to hunt over the record for that purpoe, whether or not such remarks were of such a character as to require a reversal. An examination of the statement of facts in this case shows that the testimony offered by the appellant was that the prosecuting witness, Naoma Dickey, did speak to the appellant after they reached the home of Mr. Jones, and had some conversation with him after the claimed outrage on her, while she, herself, and other witnesses introduced by the State, as positively stated that she did not speak to him and had no word with him after they reached Mr. Jones' house after the return from their ride. So that clearly, the district attorney had the right to argue the question of fact from the State's standpoint and to contend that the evidence in the case showed that this witness did not speak one word to the appellant from the time he reached the home of Mr. Jones until he left the house, and his argument and statement to this extent was clearly pertinent and proper. The fact, if so, that in the sentence quoted in the bill in this connection, he called him a libertine and rapist may have been improper, but we believe that this one expression should not overcome all of the testimony, which is full and convincing of the guilt of the appellant, and that the jury would not and could not be construed by this court to have been influenced by it to such an extent as that it did the appellant injury in the slightest degree and as the matter is presented to us it does not present reversible error. As said by this court in Turner v. State, 61 Texas Crim. Rep., 97, 133 S. W. Rep., 1055, through Judge Ramsey, in discussing such remarks by the district attorney: "We think it wholly unlikely that any jury would have been seriously moved or affected by this reference. . . . The statement contained no appeal to any matter that would ordinarily have affected the jury. It was not inflammatory, nor did it contain any statement of fact touching the case or touching appellant's guilt. While such references are to be deprecated, the argument is not of sufficient gravity to justify a reversal of the judgment."

In view of the vigorous and numerous assaults upon the charge of the court wherein appellant complains of nearly every sentence, paragraph and section of the charge of the court, we deem it best to here copy the charge of the court in full, leaving out the heading and signature:

"1st. Gentlemen of the jury: The defendant stands charged with an assault with an intent to commit rape in and upon Naoma Dickey, in Wood County, Texas, on or about January 30th, 1910. To this charge he has 'pleaded not guilty.'

"2d. Under the charge in the indictment in this case, it will be your duty to determine whether the defendant is guilty of an assault with intent to rape, aggravated assault and battery, or not guilty,

applying the facts in evidence to the law hereinafter given you in charge.

"3d.    Rape is the carnal knowledge of a woman without her consent, obtained by force.

"4th.    By carnal knowledge, as used in this charge, is meant that the male organ of the male shall penetrate the female organ of the female, the depth of penetration is immaterial in carnal knowledge if penetration actually takes place.

"5th.    To constitute an assault with intent to commit rape, there must be an assault; now, the use of any unlawful violence upon the person of another, with intent to injure her, whatever be the means or degree of violence used, is an assault and battery, any attempt to commit a battery, or any threatening gesture showing in itself or by words accompanying it, an immediate intention, coupled with an ability to commit a battery, is an assault. The injury intended may be either bodily`pain, constraint or sense of shame, or other disagreeable emotions of the mind.

"6th.    The force mentioned in foregoing definition as applied to rape and assault with intent to commit rape, is such force as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case.

"7th.    In this case, to warrant the conviction of the defendant of an assault with intent to commit the crime of rape, it should appear from the evidence applied to the foregoing definitions, of assault and assault and battery, carnal knowledge and force. 1st. That defendant, Tom Conger, in Wood County, Texas, on or about January 30th, 1910, made an assault in and upon Miss Naoma Dickey. 2d. That defendant then and there had the specific intent by such assault and by actual force, as above defined, to obtain carnal knowledge of said Naoma Dickey, without her consent and against her will.

"8th.    Now, if you shall find that the defendant, at the place and on or about the time charged in the indictment, did assault Naoma Dickey, with the specific intent then and there by such assault and by actual force, above defined, to have carnal knowledge of said Naoma Dickey by actual penetration, without her consent and against her will, you will convict the defendant of an assault with intent to commit rape as charged and assess his punishment at confinement in the penitentiary for any term of years not less than two.

"9th.    If you shall find that defendant did not assault Miss Naoma Dickey, or if you have a reasonable doubt as to whether he assaulted her, you must acquit.

"10th.    If you shall find that defendant embraced and kissed Miss Naoma Dickey, with her consent, or if you have a reasonable doubt as to whether he embraced and kissed her with her consent, then you

are instructed that such acts upon his part with her consent would not contitute an assault herein defined.

"11.   If you shall find that defendant assaulted Naoma Dickey, but you find he did not have the specific intent to have carnal knowledge of said Naoma Dickey, or if you have a reasonable doubt as to whether he had such specific intent, you will acquit him of assault with intent to commit rape and find him guilty of an aggravated assault and battery; or should you find that defendant assaulted Miss Naoma Dickey with the intent to have carnal knowledge of her, yet if you find he did not have the specific intent to obtain such carnal knowledge of her by force and without her consent and against her will, or if you have a reasonable doubt as to whether he had such intent, you will acquit him of assault with intent to commit the crime of rape and convict him of an aggravated assault and battery.   Should you find that defendant assaulted Miss Naoma Dickey, but you find he had the intent to have carnal knowledge of her with her consent, you will find him guilty of no higher offense than aggravated assault and battery.

"12th.   Should you find the defendant guilty of an assault, but you have a reasonable doubt as to whether such assault was with intent to commit the crime of rape, you will give him the benefit of the doubt and convict him of an aggravated assault and battery.

"13th.   If you shall, under the foregoing instructions, find defendant guilty of an aggravated assault and battery, you will affix his punishment at a fine of not less than $25.00 nor more than $1000.00, or by imprisonment in the county jail for not less than one month nor more than two years, or by both such fine and imprisonment.

"14th.   The defendant is presumed to be innocent until his guilt is established by legal evidence, and in case you have a reasonable doubt as to his guilt, you must acquit.

"15th.   You are the exclusive judges of the facts proven, of the credibility of the witnesses and the weight to be given their testimony; the law you must receive from the charge of the court.

"16th.   Should you find defendant guilty, so say and of what offense, assessing the proper punishment therefor.

"17th.   Should you find the defendant not guilty, simply say so."

The appellant, as shown by the record, requested only two charges which the court refused to give.   They were on the subject of the force necessary to justify a conviction of the defendant.   The first of these, after requiring that the jury must believe that the assault was by force and without her consent, had this:   "And at all hazards, and by the use of such force as would overcome any resistance which she might oppose or offer to him."   In the other requested charge such force was required to be to this extent:   "As would overcome any and all resistance which she might offer."   Penal Code, Article 634, is: "The definition of 'force,' as applicable to assault and battery, applies also to the crime of rape, and it must have been such as might reason-

ably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties, and other circumstances of the case."

It will be seen by reference to paragraphs 6, 7 and 8 of the court's charge above, that the charge followed, not only substantially, but literally, this definition of force and submitted to the jury that it was necessary for the jury to find that appellant had used that force before they could convict him. It will be also seen that by the appellant's requested charges, a much greater degree of force is required than the statute requires. The court had no right to require more than the statute does, and the appellant can not complain that his special charges, which require more than the law requires, were refused. There may be some loose or general expressions in some of the decisions of this court, wherein such terms in describing force have been used or permitted, as are given in appellant's requested charge, but upon consideration of them, it will be seen that the point was not made at any time that any such expressions were necessary to be used in the charge, but this court has, at all times, approved the charges of the lower court on this subject when they followed the language of the statute. Anchicks v. State, 6 Texas Crim. App., 524; Jones v. State, 10 Texas Crim. App., 552; Sanford v. State, 12 Texas Crim. App., 196; Favors v. State, 20 Texas Crim. App., 155; Fitzgerald v. State, 20 Texas Crim. App., 281; Brown v. State, 27 Texas Crim. App., 330; Walton v. State, 29 Texas Crim. App., 163; Passmore v. State, 29 Texas Crim. App., 241. Many other cases might be cited but we deem it unnecessary.

The 14th ground of appellant's motion complains that the court erred in his charge, because it is confusing and misleading, in that it does not clearly and accurately differentiate assault with intent to rape from aggravated assault and battery. This is too general for us to consider. Beauchamp v. State, and Ward v. State, not yet reported.

More than seven typewritten pages of appellant's motion for new trial is devoted to complaints of omission and commission in the court's charge. However, not in a single one of the causes of complaint did appellant request any special charge of the court below to correct what he claims was such commission or omission. Where this is the case, this court, as a general proposition, does not look upon such assaults upon the charge of the court with much favor, because if there was error as complained of, it was the duty of the appellant to call attention to it at the time by requesting special charges to cover the point so that the court would have an opportunity, before delivering his charge, and the verdict of the jury, to correct whatever errors, if any, he may have inadvertently committed. But especially is this the case in view of article 723 of the Code of Criminal Procedure, which prohibits this court from reversing the judgment of the lower court unless, in the opinion of this court, such error was calculated to

injure the rights of the defendant. We think it unnecessary to discuss at length the various objections urged by appellant to various and sundry paragraphs of the charge. It is elementary that the whole of the charge must be taken into consideration in determining complaints against any part thereof, and if the charge, as a whole, is substantially correct when no special charges have been requested, it will be held sufficient.

The appellant complains of the second paragraph of the court's charge, because, he claims, it is not the duty of the jury to determine that a defendant is not guilty, but it is their duty to acquit, unless they determine from the evidence, beyond a reasonable doubt, that he is guilty. Such we understand to be the law, and while the expression of the court in this paragraph of the charge that it was the duty of the jury to determine whether or not the defendant was guilty, is an improper expression, the jury could not have been misled thereby because the court expressly tells them in the 14th subdivision, that the defendant is presumed to be innocent until his guilt is established by legal evidence, and in case they have a reasonable doubt as to his guilt, they must acquit him.

Complaint is also made of the last clause of the 5th paragraph of the charge, wherein this language is used: "The injury intended may be either bodily pain, constraint and sense of shame or other disagreeable emotions of the mind," appellant contending that this isolated sentence in the charge, authorized the jury to find the defendant guilty of assault with intent to rape, if they found that the assault made upon prosecutrix created in her mind a sense of shame or other disagreeable emotions of the mind, irrespective of whether such assault was accompanied by such force as the law requires or not. The charge, taken as a whole, is not reasonably susceptible of the construction contended for by appellant, and the jury could not have been misled in that way thereby.

The 6th paragraph of the charge is attacked, because it does not define force in the language of the statute, in that it does not state that the force intended "must be," etc., and that said paragraph does not state the quantity of force and the indispensableness of the quantity of force necessary, in that it does not inform the jury that such force must be such as would overcome any and all resistance which the assaulted party might offer. We believe the paragraph attacked is, if anything, a happier expression and at least in substance, if not literal compliance, with the statute. As shown above, the law does not require any greater degree of force than as laid down in the statute and that contended for by appellant is not required.

Appellant next complains of the 7th paragraph of the charge of the court, because the constituents of the offense are not required to be found by the jury from the evidence beyond a reasonable doubt, and that neither said paragraph nor the definitions referred to therein,

properly define assault as applicable to the charge of assault with intent to rape, nor does it properly define the force necessary; and because the word "will" was omitted (doubtless by inadvertence), at the end of this paragraph. As shown above, the whole of the charge must be considered in passing on any particular portion thereof. The court did clearly give the statute with reference to the presumptive innocence of the defendant and the reasonable doubt in the very language of the statute in the 14th paragraph of the charge of the court. Judge White, for this court, in Hutto v. State, 7 Texas Crim. App., 48, on this subject, says: "With regard to the presumption of innocence, whilst it has ever been held a ground of reversal where the court has refused to give it when properly asked, and whilst it is generally agreed that it would always be better for the court to give it in charge, in connection with the reasonable doubt, in the language of the statute (Pasc. Dig., art. 3105), yet we know of no case in our own or other States which has gone to the extent of reversing a judgment for the want of such an instruction, where it was not expressly asked and refused. Thomas v. The State, 40 Texas, 36; Black v. The State, 1 Texas Crim. App., 368; Coffee v. The State, 5 Texas Crim. App., 545; McMullen v. The State, 5 Texas Crim. App., 577, and authorities collated."

Some of the earlier cases by this court held that even where the court had failed to give the presumption of innocence and reasonable doubt statute to the jury, it would not be reversible error, unless the court was requested by special charge to give it and refused. This would especially be true since the enactment of art. 723, Code Criminal Procedure. McCall v. State, 14 Texas Crim. App., 353; Farriss v. State, 55 Texas Crim. Rep., 481, 117 S. W. Rep., 798. There is no merit in the other contentions of appellant as to this paragraph of the court's charge. The omission of the word "will" at the end of the paragraph could not and is not shown to have in any way affected the appellant's rights. Besides, the charge, as a whole, in other places, clearly supplied the omission of this word "will" in this paragraph.

The appellant's next attack is upon the 8th paragraph of the court's charge, for various reasons unnecessary to state. They are merely reiterations of other matters hereinabove discussed. This paragraph of the court's charge considered with reference to the charge in full is not subject to any of the criticisms by appellant so as to show reversible error.

Appellant next attacks the 9th paragraph of the court's charge, claiming that it imposes upon appellant the burden of proving that he did not commit the assault charged, and because it virtually instructs the jury that if they find that defendant committed an assault of any character upon Naoma Dickey, they shall find him guilty of an assault with intent to rape, regardless of what defendant's intentions

were or what degree of force he used, and because from it they must find that he did not commit any character of assault, and that it takes away and excludes from the jury the issue of whether or not the defendant is guilty of an aggravated assault, but that they must convict him of assault with intent to rape, unless they find that he made no assault of any character upon said witness. The first portion of this paragraph may not be a happy expression, but to take the whole paragraph, it is not subject to the attack made upon it, and especially when it is considered, as it must be, with reference to the whole charge of the court. It could not have misled the jury and in connection with the whole charge, it did not require the burden complained of by appellant. In this connection, we state that there were but two theories of the parties to this prosecution. The State's was that the appellant was guilty of assault with intent to rape. The appellant's testimony would tend to show that he was guilty of nothing, because the whole testimony in the case shows clearly that either the appellant was guilty as charged in the indictment, or he was guilty of nothing. No assault and battery, or no assault is shown other than the intent to commit rape by the State's testimony and by the appellant's testimony it is shown that the embracing and kissing of the prosecuting witness by the appellant was with her consent and to which she made no objections, but rather invited it.

Complaint is next made of the 10th paragraph of the court's charge, because it imposed upon defendant the burden of proving that he embraced and kissed the witness with her consent, and it was wrong and confusing because the court gave undue prominence that such must have been done with her consent, and charged twice in this paragraph, that it must have been done with her consent. This may not be a happy expression by the court, but no injury could have occurred to the appellant thereby.

Complaint is also made of the 11th paragraph, because before it authorized appellant's conviction of aggravated assault and battery, they must find that the defendant, at the time, did not have the specific intent to commit the offense of rape, thereby casting the burden of proving his intent to commit rape upon defendant, and before they could convict him of aggravated assault, they must find that he committed an assault upon her; and because the charge is more onerous than the law requires, in that if they find he committed an assault upon the witness, they will find him guilty; whereas, the law, as he claims, is that unless the jury should believe from the evidence, beyond a reasonable doubt, that he so committed an assault, they should acquit; and because the charge authorized the jury to find him guilty of an aggravated assault when the court has nowhere defined the offense of aggravated assault. This charge, taken in connection with the whole charge of the court, is more favorable to the appellant than he was entitled to. Besides, as stated above, the evidence shows

that he was either guilty of an assault with intent to rape as charged by the State, or that he was guilty of nothing. Besides, the attacks on this paragraph of the charge are untenable when considered in connection with the whole charge.

The last assault on the court's charge is on the 15th paragraph. Appellant claims that this charge assumed that an offense has been committed. We think it clearly does not. In addition to the authorities cited above, see also: Railsback v. State, 53 Texas Crim. Rep., 542; Herbert v. State, 49 Texas Crim. Rep., 72; Carter v. State, 44 Texas Crim. Rep., 312, 70 S. W. Rep., 970; Hudson v. State, 49 Texas Crim. Rep., 24, 90 S. W. Rep., 177.

We have undertaken to give, and believe we have given, thorough and careful consideration to all of the questions raised by appellant's attorneys in their able and vigorous presentation of this case, and upon a consideration of the whole case, we believe that the appellant has had a fair and impartial trial; that from the State's side, the evidence fully and clearly justifies the verdict of the jury, and that no reversible error has been pointed out sufficient to authorize this court to reverse the case. The contradiction in the testimony, the credibility of the witnesses and the weight to be given to their testimony was for the jury and the lower court, and this court has no authority to reverse under such circumstances.

The judgment will, therefore, in all things, be affirmed.

Davidson, Presiding Judge, absent.

*Affirmed.*