## BEN MIMS v. STATE.

No. 2081.  Decided January 15, 1913.

Rehearing Denied February 12, 1913.

**1.—Murder—Evidence—Tracks—Bill of Exceptions—Lying in Wait.**

Where it appeared from the bill of exceptions that defendant's objections to the admission of testimony, as to tracks near the scene of the homicide, were not approved by the court as a statement of facts, the same cannot be considered on appeal; besides, the bill of exceptions did not point out the error; however, the testimony was admissible; and besides, the defendant having been acquitted of murder and convicted of manslaughter, the question of lying in wait, which the state attempted to establish by this testimony, passed out of the case, and there was no error.

**2.—Same—Evidence—Court Interrogating Witnesses.**

Where, upon trial of murder, the court examined the witness as to the distance between certain points, to make his testimony understood, and the witness returned the next morning and upon his own solicitation was permitted to correct his testimony and to show that he stepped the distance that morning, giving it accurately, there was no error.

**3.—Same—Charge of Court—Motive.**

Where, upon trial of murder, the State showed that the deceased had money shortly before the homicide and none after the body was found next morning, there was no error in the court's failure to limit this testimony to the question of motive; besides, defendant having been convicted of manslaughter, this question passed out of the case.

**4.—Same—Newly Discovered Evidence.**

Where the alleged newly discovered evidence must have been known to defendant before trial, or that he exerted no diligence to obtain it, there was no error in overruling his motion for new trial on this ground.

**5.—Same—Sufficiency of the Evidence.**

Where defendant was convicted of manslaughter and the evidence amply sustained the conviction, there was no error.

Appeal from the District Court of Freestone. Tried below before the Hon. H. B. Daviss.

Appeal from a conviction of manslaughter; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Bell & Fryer,* for appellant.—On the question of the court's conduct in examining witnesses: Kirk v. State, 35 Texas Crim. Rep., 224; Crook v. State, 27 Texas Crim. App., 198; Reason v. State, 30 S. W. Rep., 780; Lawson v. State, 32 S. W. Rep., 895; Simmons v. State, 56 Tex. Crim. Rep., 339, 117 S. W. Rep., 141; Benson v. State, 44 S. W. Rep., 163.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, JUDGE.—Appellant was charged and tried for murder, convicted of manslaughter and his penalty fixed at five years in the penitentiary.

On the night of November 5, 1910, a large number of negroes had a party of some kind at the house of one of their number, at which they had a supper and also had articles for sale and sold articles to raise money for some purpose. As seems to be the case on most occasions of the kind, there was more or less drinking by some of the men in attendance. The day of the night of the party, or perhaps the day before, the deceased, John Willis Williams, had sold some cotton and received a considerable sum of money therefor, which the evidence tends to show, if it does not directly show, he carried with him in his pocket and had it at the party that night. He bought some small cheap article at the party, pulled out the money and handed a $20 bill, which was to be changed and out of which he was to pay for the article and get back the balance. This was done openly and publicly and while there is no direct testimony that the appellant saw and knew this at the time, from the evidence, it can be gathered that he had the opportunity to see and perhaps did see this at the time.

The night seems to have been somewhat cool if not cold. The negroes had a large fire out in the yard near the house. The house was a small one, could not contain all of the crowd and while it is shown that there were a large number in the house, it is also shown that there were a considerable number outside of the house at this fire. Among them was appellant's wife and another negro woman. It seems that shortly before this money changing, deceased, somewhat, if not considerably under the influence of liquor, sat down in the lap of this other negro woman and partly in that of appellant's wife and placed his hand apparently familiarly on her shoulder. It also seems that this fact was called to the attention of appellant by his wife or someone else. Deceased then went into the house, when, it seems this money transaction occurred. Appellant appeared about the door of the house at this time with his face towards it, looking into the house.

From the State's witnesses it is clearly shown that deceased then started out of the house, announcing that he was going home and appellant then said to him, "No, you can't get out of here." Deceased replied, "What have I done to you." Appellant said, "You heard what I said, if you do I will kill you." That deceased then started out at the door and appellant struck him in the face on the forehead with a bottle, cutting his head from which the blood streamed down. From State's witnesses, which were numerous on this point, it appears that this assault and battery by appellant on deceased on this occasion was without any provocation or justification whatever. The defendant's theory and his testimony in substance was that at the time the deceased started out the door he, the appellant, was talking to one Barnes and appellant's wife and as deceased started out the door, appellant told him he wanted to see him and that he would let him out the door as soon as he got through talking to these per-

sons; that deceased refused to wait, walked back to the counter in the house, pulled off his hat, got a knife and came at appellant and he thereupon hit him with a bottle.

Immediately after this deceased somewhat hurriedly left and rapidly went to his home some few miles distant; that not a great while after this, the appellant and his wife also left the party going towards their home. The night was dark. Both the deceased and appellant had to travel the same road home and appellant had to pass nearby deceased's house, his house being beyond that of deceased. When deceased left the party, he did go to his home. His wife was at his home, she not having been to the party but was in bed and had been asleep.

The theory of the State, it seems, was that appellant, when he got within a short distance of deceased's house, prepared himself with good-sized rocks, sent his wife to deceased's house to induce him to come out and come down the road some distance so that appellant, and perhaps his wife returning, could way-lay and did way-lay and assault and kill him for the purpose of robbing him. The State had testimony on this point to the effect that appellant's wife did go to the house of the deceased, call him out and after some hesitancy he followed after her down the road some 100 or 120 yards from his house, where the killing occurred. When deceased left his house on this occasion, he took a double-barrel shotgun with him. Deceased was killed by either strokes from the appellant with the barrels of deceased's own gun or with rocks with which he had armed himself, one or the other, or both. Appellant's claim on this point was, in effect, that he did not send his wife after deceased and have her and him come down to where he was lying in wait, but that deceased was out with his gun hunting for him, appellant, and that when they met in the road, deceased, after getting very close to him and his wife, hailed them and attempted to shoot him with this gun and that he seized it, wrenched it out of the deceased's hands and struck him over the head therewith. It does appear that appellant had some good sized rocks with him which he is shown to have picked up some considerable distance before reaching the point where the killing occurred, which rocks were found at the place of the killing. The stock of deceased's gun was also found down in a field near by behind or at a log and it seems that appellant himself took it there, but that he took the barrels on with him and delivered it to persons, ultimately reaching the sheriff and was identified and introduced on the trial of the case. After thus striking the deceased on the head and crushing his skull, appellant claims that he was not dead and in order to prevent persons passing along from running over him, he dragged his body out of the road into this field with his head at the fence and his feet extending into the field therefrom. It was also shown that there was blood in the pockets of the deceased's pants in such way as to show that it was made from a bloody hand

inserted therein and there was no money found on the person of the deceased when he was first searched therefor by parties reaching him after the killing. Appellant denied getting any of his money. The State showed that after the killing none of his money was ever returned to his wife and that she never received any of it. Appellant in his testimony and apparently from his theory of the case, claimed that the killing was done by him in self-defense and did not claim that it was because of the insult or claimed insult to appellant's wife at the party.

By one of appellant's bills it is shown that the State's witness Ledbetter testified, over his objections, to the effect that on Sunday morning after the killing, he went down to the place where deceased was killed and saw tracks of two persons around a certain post-oak bush on the west side of the road six or seven steps from the body of the deceased near the pasture fence on the west side of the lane; that he also saw tracks up and down the fence on that side of the lane and saw tracks of a person inside of the field on the east side of the lane opposite the body of deceased which led from the fence down into the cotton field twenty or thirty steps from the body, and the person making these tracks kneeled down in the field and he saw knee prints and toe prints made by such person twenty or thirty steps from the body. Another bill, in substantially the same way, shows that the State was permitted to prove by Chavers that the next morning after the killing he found in the pasture on the west side of the lane opposite the body some six or seven steps from the place of the killing, a piece of an old single-tree leaning against a small post oak bush. This is, in substance, the whole of these bills, except the objections made to the introduction of this testimony. It also appears that later the appellant moved to exclude this testimony for substantially the same reasons for which he had objected thereto. The substance of appellant's objections to all this testimony was that the said tracks were not shown to bear any resemblance to appellant's, and that such evidence was immaterial, and because many other persons had been at and around the body on the night before, and that said evidence was calculated and did prejudice the jury against the defendant by attempting to show that he could have made said tracks while lying in wait for deceased, and that there was not connection shown between the single-tree and the killing, or with the defendant, and that appellant was not shown to have ever had or used said single-tree or that it had been used by anyone in the said difficulty, and that it was immaterial and prejudicial. It will be seen by this that all these objections were mere objections and not approved by the court as a statement of the facts and cannot be so considered by this court in that particular. The bill in no way so states the facts surrounding the matter as to show error, so that this court can not consider the bills. Conger v. State, 63 Tex. Crim. Rep., 312, 140 S. W. Rep., 1112, and authorities there cited. However, the court admitted

this testimony on the theory that the evidence tended to show that appellant way-laid the deceased at this point and that the objections to this testimony went to the weight of it and not to the admissibility, and that the jury could consider it on said theory of the case. In our opinion the bill does not show that the admission of this evidence was reversible error. Besides, as the appellant was acquitted of both murder in the first and second degrees and found guilty of manslaughter only, we think, even if inadmissible, it could not and would not injuriously affect him.

There is another bill by appellant complaining of the court asking a certain witness question about the distance from where deceased was killed to his house and to other houses, the court claiming, on objections by appellant, that the witness' testimony was not understood and he asked the questions in order that it might be understood. The witness himself next morning came back and at his own solicitation was permitted to take the stand to correct his testimony the day before about the distance, showing that he had that morning gone and stepped the distance and then gave it accurately. This bill shows no reversible error.

Appellant requested a special charge to the effect that the evidence that deceased had money before going to the party and none the next morning when his body was searched by the sheriff, was not evidence to prove defendant guilty of killing the deceased, but was introduced solely for the purpose of showing motive on the part of the defendant and that if they believed from the evidence at the time of the killing that deceased was proved not to have had any money then that they could only consider such evidence to show motive for the killing; and also complaining of the failure of the charge of the court to so instruct the jury.

It is not proper for the court to single out any particular evidence and charge on that specifically in such matters, and especially so on the question of motive, and the court did not err in refusing appellant's charge on that subject and omitting to charge at all on that subject, as claimed by appellant. There was no question in the case whatever that appellant killed the deceased. All the testimony showed and he himself so testified as stated above; he was acquitted of murder in the first and second degrees and convicted only of manslaughter and hence, even if it had been proper to so charge as claimed by appellant, it would not, under the circumstances, be reversible error not to do so.

By one ground of appellant's motion he complains that the court erroneously refused to grant a new trial, because of newly discovered evidence. The claimed newly discovered evidence is that after the trial he found out that there were powder burns on the dress of his wife, near her left shoulder when she arrived at Fairfield, the next morning after the killing the night before. This could not be newly discovered evidence, because if such was a fact, he and his wife both

were bound to have known it and even if this were not true, no diligence whatever is shown or attempted to be shown why it was not discovered until after the trial of the case.

The evidence was amply sufficient to sustain a higher grade of homicide and a much severer penalty than was inflicted. Doubtless, by the skillful management of appellant's case by his able attorneys, the jury acquitted him of all higher grades of the offense charged and merely found him guilty of manslaughter because of the claimed insulting conduct of deceased towards appellant's wife at the party.

No reversible error being shown, the judgment will be affirmed.

*Affirmed.*

[Rehearing denied February 12, 1913.—Reporter.]