### MIMS v. STATE.

(Court of Criminal Appeals of Texas. Jan. 15, 1913.)

1. HOMICIDE (§ 250*)—MANSLAUGHTER—SUFFICIENCY OF EVIDENCE.

Evidence *held* amply sufficient to sustain a conviction of manslaughter.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 515–517; Dec. Dig. § 250.*]

2. CRIMINAL LAW (§ 1120*) — APPEAL AND ERROR—BILL OF EXCEPTIONS—SUFFICIENCY.

Bills of exceptions complaining of the admission of evidence of tracks found at the scene of the homicide will not be reviewed, where they stated the objections merely as such, and were not approved as a statement of the facts on which the objection was based, and did not state sufficient facts surrounding the matter to show error.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2931–2937; Dec. Dig. § 1120.*]

3. HOMICIDE (§ 338*)—HARMLESS ERROR—ADMISSION OF EVIDENCE.

Where the theory of the state was that defendant lay in wait and killed deceased for the purpose of robbery, the admission of evidence of tracks at the scene of the homicide, if error, was harmless, where defendant was acquitted of murder, both in the first and second degrees, and found guilty of manslaughter only.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 709–713; Dec. Dig. § 338.*]

4. WITNESSES (§ 263*) — EXAMINATION OF WITNESSES—CORRECTION OF TESTIMONY.

Where a witness testified to the distances between the point where the homicide occurred and certain houses, it was not error to permit him, at his own request, to again take the stand the next day and correct his former testimony by accurately stating such distances as determined by him from having stepped them off in the interval.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 900–903; Dec. Dig. § 263.*]

5. CRIMINAL LAW (§ 811*)—REFUSAL OF INSTRUCTIONS—MOTIVE.

A requested instruction that the fact that deceased had money on his person some time before, but not when searched after, his death was not evidence of defendant's guilt, but, introduced solely to show motive, was properly refused as singling out particular evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1787, 1969–1972; Dec. Dig. § 811.*]

6. CRIMINAL LAW (§ 939*)—NEW TRIAL—NEWLY DISCOVERED EVIDENCE.

A new trial was properly denied for newly discovered evidence where no diligence to discover it before the trial was shown.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2318–2323; Dec. Dig. § 939.*]

Appeal from District Court, Freestone County; H. B. Daviss, Judge.

Ben Mims was convicted of manslaughter, and he appeals. Affirmed.

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

Bell & Fryer, of Teague, for appellant. C. E. Lane, Asst. Atty. Gen., for the State.

PRENDERGAST, J. Appellant was charged and tried for murder, convicted of manslaughter, and his penalty fixed at five years in the penitentiary.

[1] On the night of November 5, 1910, a large number of negroes had a party of some kind at the house of one of their number, at which they had a supper and also had articles for sale, and sold articles to raise money for some purpose. As seems to be the case on most occasions of the kind, there was more or less drinking by some of the men in attendance. The day of the night of the party, or, perhaps, the day before, the deceased, John Willis Williams, had sold some cotton and received a considerable sum of money therefor, which the evidence tends to show, if it does not directly show, he carried with him in his pocket, and had it at the party that night. He bought some small, cheap article at the party, pulled out the money, and handed a $20 bill, which was to be changed, and out of which he was to pay for the article and get back the balance. This was done openly and publicly; and, while there is no direct testimony that the appellant saw and knew this at the time, from the evidence it can be gathered that he had the opportunity to see, and, perhaps, did see, this at the time.

The night seems to have been somewhat cool, if not cold. The negroes had a large fire out in the yard, near the house. The house was a small one, could not contain all of the crowd; and, while it is shown that there were a large number in the house, it is also shown that there were a considerable number outside of the house at this fire. Among them was appellant's wife and another negro woman. It seems that shortly before this money changing deceased, somewhat, if not considerably, under the influence of liquor, sat down in the lap of this other negro woman and partly in that of appellant's wife, and placed his hand apparently familiarly on her shoulder. It also seems that this fact was called to the attention of appellant by his wife or some one else. Deceased then went into the house, when, it seems, this money transaction occurred. Appellant appeared about the door of the house at this time with his face towards it, looking into the house.

From the state's witnesses it is clearly shown that deceased then started out of the house, announcing that he was going home, and appellant then said to him: "No; you can't get out of here." Deceased replied, "What have I done to you?" Appellant said: "You heard what I said; if you do, I will kill you." That deceased then started out at the door, and appellant struck him in the face on the forehead with a bottle, cutting his head, from which the blood streamed down. From the state's witnesses, which were numerous on this point, it appears that this assault and battery by appellant on deceased on this occasion was without any provocation or justification whatever. The defendant's theory and his testimony, in substance, was that at the time the deceased started out the door he (the appellant) was talking to one Barnes and appellant's wife, and as deceased started out the door appellant told him he wanted to see him, and that he would let him out the door as soon as he got through talking to these persons; that deceased refused to wait, walked back to the counter in the house, pulled off his hat, got a knife, and came at appellant; and he thereupon hit him with a bottle.

Immediately after this deceased somewhat hurriedly left and rapidly went to his home some few miles distant; that not a great while after this the appellant and his wife also left the party, going towards their home. The night was dark. Both the deceased and appellant had to travel the same road home, and appellant had to pass near by deceased's house; his house being beyond that of deceased. When deceased left the party, he did go to his home. His wife was at his home; she not having been to the party, but was in bed and had been asleep.

The theory of the state, it seems, was that appellant, when he got within a short distance of deceased's house, prepared himself with good-sized rocks, sent his wife to deceased's house to induce him to come out and come down the road some distance, so that appellant, and, perhaps, his wife returning, could waylay, and did waylay and assault and kill, him, for the purpose of robbing him. The state had testimony on this point to the effect that appellant's wife did go to the house of the deceased, call him out, and after some hesitancy he followed after her down the road some 100 or 120 yards from his house, where the killing occurred. When deceased left his house on this occasion, he took a double-barrel shotgun with him. Deceased was killed, either by strokes from the appellant with the barrel of deceased's own gun, or with rocks with which he had armed himself—one or the other, or both. Appellant's claim on this point was, in effect, that he did not send his wife after deceased and have her and him come down to where he was lying in wait, but that deceased was out with his gun hunting for him (appellant), and that when they met in the road deceased, after getting very close to him and his wife, hailed them and attempted to shoot him with this gun, and that he seized it, wrenched it out of the deceased's hands, and struck him over the head therewith. It does appear that appellant had some good-sized rocks with him, which he is shown to have picked up some considerable distance before reaching the point where the killing occurred, which rocks were found

at the place of the killing. The stock of deceased's gun was also found down in a field near by, behind or at a log; and it seems that appellant himself took it there, but that he took the barrel on with him and delivered it to persons, ultimately reaching the sheriff, and was identified and introduced on the trial of the case. After thus striking the deceased on the head and crushing his skull, appellant claims that he was not dead, and, in order to prevent persons passing along from running over him, he dragged his body out of the road into this field, with his head at the fence and his feet extending into the field therefrom. It was also shown that there was blood in the pockets of the deceased's pants in such way as to show that it was made from a bloody hand inserted therein, and there was no money found on the person of the deceased when he was first searched therefor by parties reaching him after the killing. Appellant denied getting any of his money. The state showed that after the killing none of his money was ever returned to his wife, and that she never received any of it. Appellant, in his testimony, and apparently from his theory of the case, claimed that the killing was done by him in self-defense, and did not claim that it was because of the insult, or claimed insult, to appellant's wife at the party.

[2,3] By one of appellant's bills it is shown that the state's witness Ledbetter testified, over his objections, to the effect that on Sunday morning after the killing he went down to the place where deceased was killed, and saw tracks of two persons around a certain post oak bush on the west side of the road 6 or 7 steps from the body of the deceased, near the pasture fence on the west side of the lane; that he also saw tracks up and down the fence on that side of the lane, and saw tracks of a person inside of the field on the east side of the lane opposite the body of deceased, which led from the fence down into the cotton field 20 or 30 steps from the body, and the person making these tracks kneeled down in the field, and then he saw knee prints and toe prints made by such person 20 or 30 steps from the body. Another bill, in substantially the same way, shows that the state was permitted to prove by Chavers that the next morning after the killing he found in the pasture on the west side of the lane opposite the body, some 6 or 7 steps from the place of the killing, a piece of an old singletree leaning against a small post oak bush. This is, in substance, the whole of these bills, except the objections made to the introduction of this testimony. It also appears that later the appellant moved to exclude this testimony for substantially the same reasons for which he had objected thereto.

The substance of appellant's objections to all this testimony was that the said tracks were not shown to bear any resemblance to appellant's, and that such evidence was immaterial, and because many other persons had been at and around the body on the night before, and that said evidence was calculated to and did prejudice the jury against the defendant by attempting to show that he could have made said tracks while lying in wait for deceased, and that there was no connection shown between the singletree and the killing, or with the defendant, and that appellant was not shown to have ever had or used said singletree, or that it had been used by any one in the said difficulty, and that it was immaterial and prejudicial. It will be seen by this that all these objections were mere objections, and not approved by the court as a statement of the facts, and cannot be so considered by this court in that particular. The bill in no way so states the facts surrounding the matter as to show error, so that this court cannot consider the bills. Conger v. State, 63 Tex. Cr. R. 312, 140 S. W. 1112, and authorities there cited. However, the court admitted this testimony on the theory that the evidence tended to show that appellant waylaid the deceased at this point, and that the objections to this testimony went to the weight of it, and not to the admissibility, and that the jury could consider it on said theory of the case. In our opinion, the bill does not show that the admission of this evidence was reversible error. Besides, as the appellant was acquitted of both murder in the first and second degrees and found guilty of manslaughter only, we think, even if inadmissible, it could not and would not injuriously affect him.

[4] There is another bill by appellant complaining of the court asking a certain witness questions about the distance from where deceased was killed to his house and to other houses; the court claiming, on objections by appellant, that the witness' testimony was not understood, and he asked the questions in order that it might be understood. The witness himself, next morning, came back, and at his own solicitation was permitted to take the stand to correct his testimony of the day before about the distance, showing that he had that morning gone and stepped the distance, and then gave it accurately. This bill shows no reversible error.

[5] Appellant requested a special charge to the effect that the evidence that deceased had money before going to the party and none the next morning, when his body was searched by the sheriff, was not evidence to prove defendant guilty of killing the deceased, but was introduced solely for the purpose of showing motive on the part of the defendant, and that if they believed from the evidence, at the time of the killing, that deceased was proved not to have had any money, then that they could only consider such evidence to show motive for the killing, and

also complaining of the failure of the charge of the court to so instruct the jury.

It is not proper for the court to single out any particular evidence and charge on that specifically in such matters, and especially só on the question of motive; and the court did not err in refusing appellant's charge on that subject and omitting to charge at all on that subject, as claimed by appellant. There was no question in the case whatever that appellant killed the deceased. All the testimony so showed, and he himself so testified, as stated above. He was acquitted of murder in the first and second degrees and convicted only of manslaughter; and hence, even if it had been proper to so charge, as claimed by appellant, it would not, under the circumstances, be reversible error not to do so.

[6] By one ground of appellant's motion he complains that the court erroneously refused to grant a new trial because of newly discovered evidence. The claimed newly discovered evidence is that after the trial he found out that there were powder burns on the dress of his wife, near her left shoulder, when she arrived at Fairfield the next morning after the killing the night before. This could not be newly discovered evidence, because, if such was a fact, he and his wife both were bound to have known it; and even if this were not true no diligence whatever is shown, or attempted to be shown, why it was not discovered until after the trial of the case.

The evidence was amply sufficient to sustain a higher grade of homicide and a much severer penalty than was inflicted. Doubtless, by the skillful management of appellant's case by his able attorneys, the jury acquitted him of all higher grades of the offense charged and merely found him guilty of manslaughter because of the claimed insulting conduct of deceased towards appellant's wife at the party.

No reversible error being shown, the judgment will be affirmed.