### EDWARD BEASON V. THE STATE.

#### No. 4815. Decided January 22, 1919.

**1.—Assault to Rape—Sufficiency of the Evidence.**

Where, upon trial of assault to rape by force, the evidence sustained the conviction, there was no reversible error. Following Conger v. State, 63 Texas Crim. Rep., 312, and other cases.

**2.—Same—Rule Stated—Resistance.**

If the facts show that it was owing to no lack of effort on the part of the accused that he did not accomplish his purpose to rape the woman, and that it was only on account of her effective resistance and speed that she escaped, the conviction will not be disturbed. Following Stout v. State, 22 Texas Crim. App., 339, and other cases.

**3.—Same—Charge of Court—Requested Charges.**

Where, upon trial of assault to rape by force, the court gave an apt and correct charge submitting to the jury for a finding every question that was raised by the evidence, there was no error in the refusal of requested charges which were clearly on the weight of the evidence.

**4.—Same—Requested Charge.**

Neither did the court err in refusing defendant's requested charge which was not based on the evidence and was argumentative.

**5.—Same—Argument of Counsel—Bill of Exceptions.**

Where the court withdrew by requested charge certain argument of the State's counsel, and the bill was defective with reference thereto, there was no reversible error.

**6.—Same—Aggravated Assault—Sufficiency of the Evidence.**

Where, upon trial of assault to rape by force, the evidence showed that defendant had no other purpose than to make the assault with the intent to commit rape, and not merely to secure carnal favors with the consent of the assaulted party, the conviction for assault to rape was sustained, and it was not a case of aggravated assault.

Appeal from the District Court of Cherokee. Tried below before the Hon. L. D. Guinn.

Appeal from a conviction of assault with intent to rape; penalty, seven years imprisonment in the penitentiary.

The opinion states the case.

*Perkins & Perkins,* for appellant.—On question of insufficiency of the evidence: Thomas v. State, 16 Texas Crim. App., 535; Cotton v. State, 52 Texas Crim. Rep., 55; Simmons v. State, 44 id., 488.

On question of court's charge: Schields v. State, 32 Texas Crim. Rep., 493; Collins v. State, 52 id., 498; Dockery v. State, 35 id. 487.

*E. B. Hendricks,* Assistant Attorney General, for the State.

PRENDERGAST, JUDGE.—Appellant was convicted of assault to rape Miss Allie Alexander, a woman, by force.

Appellant contends the evidence was insufficient to sustain the conviction. The statement of facts has been read and studied more than once. The evidence was amply sufficient to sustain the conviction. It is unnecessary to recite the whole evidence. Some of the main features of it will be stated.

Miss Alexander, the assaulted girl, was a young woman about twenty-one years of age. The appellant a young man twenty-six or twenty-seven years of age. She was barely acquainted with him. She did not live in the community where the assault was committed but lived elsewhere with her parents. On July 24th she was on a visit to her married sister, who lived near where the assault occurred. The assault occurred in the dead hours of night, the exact hour not stated, but it must have been late in the night. In the evening appellant sought to make an engagement with her to take her from Shiloh Church that night back to her sister's, whom she was visiting. She hesitated to make an engagement with him because she was so slightly acquainted with him. However, others interceded in his behalf, and upon their assurance that he was all right she made the engagement with him. Her married sister and her husband attended the church that night as well as one of her unmarried sisters. Her married sister and her husband were in a wagon. Her single sister, whom a young man escorted, and her cousin, a young man, who accompanied another young lady, walked. Appellant took her in his buggy. The married sister and her husband left the church first. It was understood between appellant and her, and her unmarried sister and the other young lady that they would precede them in the buggy but drive rather slow, which they did. The distance from the church to her married sister's is not given, but must have been a few miles. There were several residences along the road from the church to her married sister's, close to the road, the last one was Mr. Rozelle's. The distance between Rozelle's and her sister's, along the road, was about 700 yards—not quite so far by air line. It was about 390 yards from Rozelle's, along the main road to where a road turned off to go up to her sister's, and about 315 yards from where this road turned off to her sister's. It was about 400 yards from where this road turned out back about the opposite direction of her sister's to where a Mr. Mullenex lived.

Appellant's conduct towards Miss Alexander was not improper until

they had passed Mr. Rozelle's house. After he had passed it he announced to her that that was the last residence they would pass until they reached her sister's, and that he began his improper conduct.

This conduct consisted at first of his placing his arm behind her on the back of the buggy seat. She protested and objected to this and demanded that he should not so act. He persisted. She then took his hand and arm from behind her and pulled it away therefrom. When she did so he would take hold of her hand and attempt to hold it, but she would wrench it away from him. When he got to the point of this cross-roads he announced to her that he would stop there. The night was quite dark. She objected and protested, and repeatedly demanded that he should drive on to her sister's and not stop there, but he refused. He then turned his buggy down the road toward Mr. Mullenex's, in the opposite direction from her sister's. She protested and objected and demanded that he should permit her to get out, which he refused to permit and prevented her from getting out. She said: "I tried to get out, but he wouldn't let me out. He put his arms around me then and commenced holding me that way. He just put both of his arms around me this way (witness indicating) and was holding me and I could not get out." She swore he finally told her that if she would get out, he, too, would get out—"we will get out." She told him she was not afraid to go on home to her sister's alone and persisted in her efforts to get out and go. But he in offering to then let her get out said repeatedly: "We will get out here." She told him she didn't want him to get out but she wanted him to let her get out. She swore: "I think I got my foot on the stirrup then and would have gotten out but he flew mad and showed me no respect and I was afraid to get out there. I was afraid to get out, I was afraid he would get me out of the buggy and I could not do anything with him—was afraid if he got me out of the buggy I could not do anything with him, I was afraid he would overpower me. As to why I did not get out of the buggy, he was holding me with his arms and hands. He had both of his arms and hands hold of me, and I could not get out. . . . I tried to get out all of the time but I couldn't." By this time appellant had driven about 215 yards from the crossing of said roads towards Mr. Mullenex's and he there stopped the buggy. It was from about 200 to 220 yards from where he stopped to Mr. Mullenex's house. She swore that when "he stopped and I tried to get out—kept on trying to get out all of the time—but he would not let me out. I tried to get him to let me out when he stopped and told him everything I could, but he wouldn't let me out and still held me, and I tried to get out anyhow and could not. He was holding me and I was scuffling around trying to get out and my side was against the arm piece of the buggy and my head back this way, and it was hurting my side, this arm piece was; and he just kept on putting his arms around me and squeezing me and I was wrenching about all I could. I was just scared nearly to death and couldn't hardly get my breath, and he kept on holding me tighter and putting

his feet and legs against me and I tried to shove him away with my feet and then he put his leg over me this way (witness showing). He tried then to get his left leg over this way in between my legs, but I tried to keep his leg knocked away with my knees and feet. I would just kick his leg off. He just kept on there that way, I don't know how long—trying to get his leg in between my legs, but I kept it kicked off, but in some way he got around sorter in front and sat down across my lap. He just got straddle of my lap sitting in the buggy. He was holding both of my hands down this way with both of his hands (witness showing) and I could not get him off. Part of the time he had me around the waist with both arms and part of the time he was holding my hands down in front with both hands. At that time he had gotten straddle of my lap and was sitting down on me in that way. Before he got straddle of my lap he had me around the waist with both hands and it was then that he kept on trying to put his leg in between my legs and I kept it kicked off with my knees and feet and after that he got around in front somehow and sat down straddle of my lap. Of course I was begging him to stop all of the time and when he was trying to put his leg in between my legs and I was kicking it off, he told me to stop, and I told him I would not do it and he said, 'How do you expect me to love you and you doing this way?' He kissed me more than once, but I was not willing for him to kiss me at all, and I tried to keep him from kissing me. He did not bite me but he tried to. I tried to keep him from kissing me and biting me. He kissed me but he did not bite me. I never consented for him to kiss me and never consented for him to do any of the things he was doing with me. All the time he was doing what he did, from the time he first put his arm over the seat and I took it down, and down at the corner and up that road after he turned off up towards Mr. Mullenex's house and stopped up there, I was trying all of that time to keep him from doing what he was doing. After he turned off up that road I thought I understood what he was trying to do and what he meant to do to me. I knew he was trying to overpower me then. I thought he was trying to have carnal intercourse with me, but he never did. He never succeeded in having intercourse with me because I finally got away from him. I got out from under him when he was across my lap that way, and got out through the back of the buggy. I got out over the back of the buggy and ran. . . . After I got out of the buggy I ran, I ran east back towards by brother-in-law's house. The defendant turned the buggy around, I heard him when he turned around. When I heard him turning around I ran out of the road and fell in a ditch and hid. I stayed there in that ditch for some little time, I don't know just exactly how long it was, but it seemed to me like it was a long time. I stayed there until he went on up and I heard him calling someone up there near the house. I did not halloa then but I did after he passed away and I went on up through the pasture. The defendant had passed me then and it was after I got back down near the corner. I never halloaed

up there in the road because I was afraid to, I was afraid of the defendant.

"When the defendant was scuffling with me in the buggy and when my side was across the arm piece of the buggy it hurt me, and I was sore after that a day or two in my chest and arms."

Appellant, after she got out of the buggy and escaped from him, turned and drove back rapidly hunting for her but he missed her because she was lying hid in the ditch. As soon as he passed her she got up, went back across the road, crawled under the wire fence into Mr. Rozelle's pasture. Appellant ran his buggy up to her sister's then turned and ran back down the road he had come towards where she then was, some hundreds of yards from her sister's. When she saw this she repeatedly halloaed for the young man, her cousin, to come to her and save her from appellant. Her cousin with others then went to where she was and found, as several of them swore, that she was very greatly excited, completely exhausted, was pale and trembling, and this condition continued for some time after she got to her sister and told them what had occurred. Her cousin swore that when he first got to her she seemed to be unconscious, was very nervous; shocked pretty bad. They found that some of the pins of her clothing were loose and out and a few holes torn in her dress and her clothing badly wrinkled. Her belt was pulled loose and her collar was torn. She had some smut or axle grease or something of that kind on her face and across her neck like.

Several of the witnesses, including her sister and brother-in-law, who were about or at her sister's house at the time, stated that they could not distinguish who it was when she halloaed nor all she said at the time when she called for her cousin, but what they heard was a woman halloaing and calling in distress. When her cousin and another young man, who was no kin to her, with the others, first got to her she did not then state fully what appellant had done to her. She swore that the reason she did not then do so was because of the young men being present and she did not tell it then because of that. But she did tell it to her sisters as soon as she got to the house and out of the presence and hearing of the young men. And at all times and to all those parties complained of the appellant's mistreatment of her.

All this testimony by her and the others was in no way disputed or denied.

The evidence was amply sufficient to sustain the conviction. Conger v. State, 63 Texas Crim. Rep., 312; Ross v. State, 60 Texas Crim. Rep., 547; White v. State, 60 Texas Crim. Rep., 559; Stewart v. State, 61 Texas Crim. Rep., 90; Jinkins v. State, 83 Texas Crim. Rep., 446; Taff v. State, 69 Texas Crim. Rep., 528; Washington v. State, 51 Texas Crim. Rep., 542. Mr. Branch, in sec. 1699, 2 Branch's Ann. P. C., lays down this correct principle towit: "If the facts show that it was owing to no lack of effort on the part of the accused that he did not accomplish his purpose to rape the woman and that it was only on account of her effective resistance and speed that she escaped, a conviction approved by

the trial judge, whose duty it is to set it aside if not satisfied therewith, will not be disturbed on the facts on appeal." Citing Stout v. State, 22 Texas Crim. App., 339; Crew v. State, 22 S. W. Rep., 973; Schroeder v. State, 36 S. W. Rep., 94; Berry v. State, 44 Texas Crim. Rep., 395; Castle v. State, 49 Texas Crim. Rep., 1; Rogers v. State, 65 Texas Crim. Rep., 105, 143 S. W. Rep., 631; Taff v. State, 69 Texas Crim. Rep., 90, 155 S. W. Rep., 214; Allen v. State, 76 Texas Crim. Rep., 633, 177 S. W. Rep., 88.

The court gave an apt and correct charge submitting to the jury for a finding every question that was raised by the evidence. The court, therefore, did not err in refusing to give his special charges 5 and 6, which were clearly upon the weight of the testimony. The court in the main charge more than once told the jury that they could not convict appellant of an assault with intent to rape unless they believed from the evidence beyond a reasonable doubt that he had the specific intention at the time of having carnal knowledge of said girl by force and without her consent. He also defined force as prescribed by the statute, art. 1064, P. C., and exactly as held sufficient by the decisions of this court in Conger v. State, 63 Texas Crim. Rep., 335, and cases there cited. Sec. 1103, White's Ann. P. C., and authorities there cited.

Neither did the court err in refusing appellant's seventh special charge. It was argumentative and there was no evidence upon which to base it. As stated, the court distinctly required the jury to believe beyond a reasonable doubt that if appellant committed the assault before they could convict him of an assault with intent to rape that they must believe that at the time he had the specific intention to have intercourse with her and without her consent and by such force as specifically required by the statute and the decisions. The evidence would exclude the idea that he was attempting to have carnal intercourse with her with her consent.

Appellant has a very meager bill to a statement made by the private prosecutor in his argument to the jury. The bill merely states that Mr. Norman, private prosecutor, on making the closing argument for the State, said: "It is a wonder to me he is sitting in this courthouse today." "If he had been a man of dark skin he would not be here today." That he objected to this statement and the court at his instance gave his special written instructions not to consider said remarks. The bill in no way shows the occasion for these remarks, whether they were brought out by the argument of appellant's attorneys or otherwise. In fact nothing further is shown than by the bill as stated and that the court instructed the jury at his request not to consider said remarks. These remarks in connection with the court's charge, as has often been held by this court, presents no reversible error.

The judgment is affirmed.

*Affirmed*

ON REHEARING.

January 22, 1919.

LATTIMORE, JUDGE.—This case comes before the court upon appellant's motion for rehearing based mainly on his contention that the evidence does not support the verdict.

He raises one or two objections to matters in the charge which we do not think amount to anything.

Appellant was convicted of an assault with intent to rape, and contends here that he should not have been convicted of more than an aggravated assault, for the reason that his taking the injured party into a dark road and his assaults upon her, continued for some time, had no other purpose than to secure intercourse with her by her consent. As we view it, there is no evidence in the record to justify such a conclusion. The young woman alleged to have been assaulted was not attacked at any angle as to her virtue, and credibility as a witness. Her evidence makes out an aggravated case of unprovoked and unwarranted assault, and the court fully submitted to the jury, in several phases, the question as to whether such assault was with intent to commit rape or merely to secure carnal favors with the consent of the assaulted party. A jury of his own choosing passed on that question and we do not feel disposed to interfere with their finding.

Appellant's motion is overruled.

*Overruled.*